■ The Goldman Sachs Group, Inc., Appellant, et al., Plaintiff, v Almah LLC, Respondent. [924 NYS2d 87]—

Order, Supreme Court, New York County (Richard B. Lowe, III, J.), entered April 29, 2010, which, insofar as appealed from, in an action for breach of contract, inter alia, denied plaintiff's motion to dismiss as to the first counterclaim, based on documentary evidence, unanimously reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment in favor of plaintiff-appellant dismissing the counterclaims.

Plaintiff The Goldman Sachs Group, Inc. (GS) is the tenant and defendant Almah LLC is the landlord under a 1998 lease for premises at 180 Maiden Lane entered into by their predecessors in interest. The lease was for an initial 15-year term, to expire in 2014. It had an "early termination option" which permitted the tenant to terminate in 2009 by giving notice in 2008. The tenant also had an option to extend the lease for two five-year terms if the early termination option was not exercised.

By side letter agreement executed at the same time between plaintiff Goldman, Sachs & Co. (GS & Co.) and the prior landlord, the landlord was required to pay GS & Co. a "commission" if GS & Co. waived the early termination option. GS & Co. is GS's wholly-owned subsidiary. The rationale was that a brokerage commission would be paid so the landlord would avoid the expenses of an empty premises and needing to seek a new tenant in a tough real estate market. The side letter agreement was incorporated by reference in the lease.

The lease also permits assignment or sublease with the landlord's prior written consent, which cannot be unreasonably withheld. Before the proposed effective date of the assignment or sublease, the tenant is required to deliver executed copies of the assignment or sublease documents and, if not fully disclosed thereby, a "statement of all consideration to be received by Tenant for or in connection with the assignment or sublease and the terms of payment therefor."

Article 12.6 (a) requires that the tenant share with the landlord any profit received from an assignment: "in the case of an assignment, an amount equal to fifty percent (50%) of all sums . . . and other consideration payable to Tenant by the assignee for or by reason of the assignment (including but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements . . . ) reduced . . . by (i) the actual expenses incurred in good faith by Tenant in connection with

such assignment . . . payable if, as and when Tenant receives such sums." A similar profit-sharing clause in article 12.6 (b) governs subleases. Article 12.8 provides, in relevant part: "The first sentence of Section 12.1 and Sections 12.2, 12.3, 12.4, 12.5 and 12.6 of this Article [i.e., those relating to assignment, subletting, consent and profit sharing] shall not apply to . . . any assignment or sublease by Tenant to any Related Party. . . . For the purposes of this Section, a 'Related Party' shall mean . . . (x) any corporation, partnership or other entity which, at the time of the making of such assignment or sublease or the commencement of such occupancy, is controlled by, controls or is under common control with, Tenant."

Foregoing its early termination option, by letter dated April 17, 2008, GS requested the landlord's consent to a sublease and assignment. GS proposed to sublease the premises to GS & Co. for a portion of the remaining lease term, with GS & Co. then surrendering portions of the premises in phases. GS also proposed a subsequent assignment whereby it would assign all its rights as tenant under the lease (and sublessor under the sublease) to nonparty AIG Employee Services, Inc. (AIG). AIG would thus become sublessor to GS & Co., receiving the rent, which would be paid over to the landlord until GS & Co. surrendered the premises pursuant to the sublease.

After formally informing the landlord of the terms of the proposed sublease and assignment, by letter dated May 5, 2008, GS provided drafts of the transactional documents, stating that "there is no consideration to be received by Tenant in connection with the Assignment." By a June 13, 2008 letter accompanying the executed transactional documents, GS reiterated that no consideration has been or will be paid in connection with the transaction except as set forth in the documents.

On May 19, 2008, the landlord consented to the proposed sublease and assignment. The consent letters requested a statement of all consideration to be received by GS. GS then sublet the premises to GS & Co. for the remainder of the lease term and assigned its rights and obligations under the lease and sublease to AIG; GS thereafter became AIG's subtenant at the same rent as under the lease until it surrendered such space.

Since GS did not exercise its early termination option, by letter dated July 23, 2008 GS & Co. claimed a $3.1 million commission under the side letter agreement. When the landlord denied payment, the tenant commenced this action for the commission. The landlord counterclaimed against GS for its 50% share of the value received by the tenant for the assignment and sublease transaction, claiming it was a detailed "sweet-

heart" sublease "customized" to fit GS's complex needs and that its inherent economic value constituted "other consideration" under article 12.6 of the lease. The landlord asserted that the entire transaction was worth $150 million (so its share was $75 million) because it facilitated GS's move in stages from the premises into its new world headquarters at Battery Park City. The landlord sought damages for, inter alia, breach of contract.

Before any discovery was conducted, GS moved to dismiss the counterclaims pursuant to CPLR 3211 (a) (1) and (7).* GS argued that it was entitled to dismissal of the first counterclaim (breach of contract) because all the transaction documents submitted established that it "received" no "payment" of any kind as a result of the assignment and sublease. Preliminarily, the motion court acknowledged that, because article 12.6 (a) of the lease speaks in terms of actual payment, GS's interpretation limiting the profit-sharing obligation to money received was reasonable. Nevertheless, the court denied the motion to dismiss as to the first counterclaim, finding that the term "other consideration" was ambiguous and should be interpreted with the aid of extrinsic evidence, reasoning that, since "sum" means money, if "other consideration" is to have any nonredundant meaning, it must mean more than just money, in accordance with the broad legal concept that consideration may be many forms of value.

Whether a contract is ambiguous is a question of law for the court and is to be determined by looking "within the four corners of the document" (*Kass v Kass*, 91 NY2d 554, 566 [1998], citing *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162-163 [1990]). A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning" (*Greenfield v Philles Records*, 98 NY2d 562, 570 [2002]; *see also Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]). Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings" (*Feldman v National Westminster Bank*, 303 AD2d 271, 271 [2003], *lv denied* 100 NY2d 505 [2003] [internal quotation marks and citation omitted]).

The existence of ambiguity is determined by examining the "entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed," with the wording to be considered "in the light of the obligation as a

---

* The court granted the motion as to two of the three counterclaims. The dismissal of these counterclaims is not at issue on appeal.

whole and the intention of the parties as manifested thereby" (*Kass* at 566 [internal quotation marks omitted]). The " 'intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations' " (*Del Vecchio v Cohen*, 288 AD2d 426, 427 [2001], quoting *Slamow v Del Col*, 174 AD2d 725, 726 [1991], *affd* 79 NY2d 1016 [1992]).

Applying these principles, we find that the language of article 12.6, when considered as an integrated whole and not in isolation, conveys the parties' intent that only actual "payment" made by the assignee and "receipt" by the assignor as consideration would trigger the profit-sharing clause. Indeed, article 12.6 lists several types of "consideration" and all of the examples consist of amounts payable, for one reason or another, to the tenant. The examples of "other consideration" include "sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furnishings or other personal property." Additionally, article 12.6 indicates that any "consideration" would consist of "sums" that a tenant "receives" and against which the tenant's expenses can be netted. This language in article 12.6 conveys the parties' clear intent that only tangible consideration such as cash or notes payable to the tenant could trigger the profit-sharing clause, and that any intangible benefits inuring to the tenant from the assignment and sublease, as the owner posits, in the form of inherent "value" does not suffice. Even though the word "consideration" might seem to suggest a broader meaning in general, the word should be limited to the particular object that the parties intended here. Accordingly, because it is undisputed that no "payment" was "received" as consideration for the assignment of the lease, tenant GS was entitled to a dismissal of the counterclaim in its entirety. Concur—Tom, J.P., Friedman, Catterson, Renwick and Abdus-Salaam, JJ.