799 F.Supp.2d 230 (2011)
In the Matter of the Application of Anthony TOSCANO, or of the Shareholders and Directors of Southampton Brick & Tile, Inc. for the Voluntary Dissolution of Said Corporation.
United States of America, Intervenor-Plaintiff,
v.
Angelo Toscano, Anthony Toscano, Southampton Brick and Tile, LLC, William F. Andes, Jr., Esq., Intervenor-Defendants.
No. 08-CV-1983 ADS ETB.
United States District Court, E.D. New York.
July 26, 2011.
*232 United States Department of Justice, Tax Division, by Joseph Rodriguez, Trial Attorney, Washington, DC.
Richard A. Kraslow, P.C., by Richard A. Kraslow, Esq., Of Counsel, Melville, NY, Attorney for Angelo Toscano.
Conforti & Waller, LLP, by Anthony T. Conforti, Esq., Of Counsel, Hauppauge, NY, Attorneys for Anthony Toscano.
*233 Lynn, Gartner & Dunne, LLP, by Stephen W. Livingston, Esq., Of Counsel, Mineola, NY, Attorneys for Southampton Brick & Tile, LLC.
Brody O'Connor & O'Connor, by Patricia A. O'Connor, Esq., Of Counsel, Northport, NY, Attorneys for Southampton Brick & Tile, LLC.
Schlam Stone & Dolan LLP, by Andrew Seth Harris, Esq., Of Counsel, New York, NY, Attorneys for Southampton Brick & Tile, LLC.

MEMORANDUM OF DECISION AND ORDER
SPATT, District Judge.
This is the second motion to come before this Court involving the distribution of the interest of Angelo Toscano ("Toscano") in the proceeds deriving from the dissolution of Southampton Brick & Tile Inc. ("SBT INC."). The first dispute involved whether the United States Government could foreclose on federal tax liens against Toscano's interest in the dissolution proceeds in light of the fact that Intervenor-Defendant Southampton Brick and Tile, LLC ("SBT LLC") purported to have a valid agreement signed by Toscano assigning the entirety of his interest in the dissolution proceeds to SBT LLC. By order dated May 25, 2010, this Court held that the Government's lien was superior to any right SBT LLC might have to Toscano's interest in the dissolution proceeds. Therefore the Government was entitled to foreclose on all of its tax liens on Toscano's interest in the dissolution proceeds. See In re Toscano ("Toscano I"), No. 08-CV-1983, 2010 WL 3174389 (E.D.N.Y. May 25, 2010).
Presently before the Court is SBT LLC's summary judgment motion pursuant to Federal Rule of Civil Procedure 56 seeking a determination that SBT LLC is the rightful owner of the remainder of Toscano's interest in the dissolution proceeds. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. The Origins of Southampton Brick & Tile LLC and the Operating Agreement
In or around 1975 Angelo Toscano and his brother, Anthony Toscano founded Southampton Brick & Tile, Inc., a wholesaler and retailer of masonry and tile products. Each brother held a 50% stake in SBT INC. and Angelo Toscano held the position of Vice-President. On August 3, 1998, Anthony Toscano commenced a dissolution action in New York Supreme Court, Suffolk County (the "Dissolution Action"). A final order of dissolution was entered by the state court on July 22, 2002. In the same order, the State court appointed a receiver to effectuate the dissolution.
In December of 2002, Toscano met with Bert E. Brodsky ("Brodsky") and Barnett Brown ("Brown"), who owned a corporation called 4B's Realty VIII ("4B's Realty"). At this meeting, Toscano expressed an interest in continuing SBT INC.'s business by purchasing the masonry and tile divisions of SBT INC. at auction. Toscano and 4B's Realty agreed to a joint-venture whereby 4B's Realty would provide Toscano with the funds to bid on the two SBT INC. divisions at the auction. If Toscano was successful they would jointly operate the new business. The parties agreed that Toscano and 4B's Realty would each own 50% of the new company. The parties also agreed that in consideration for each of their 50% interest, Toscano and 4B's Realty would provide an initial capital contribution.
*234 While at the time of the initial discussions in December 2002 the exact amount of Toscano's interest in the proceeds from the Dissolution Action was still unresolved, the parties do not dispute that at least some portion of what Toscano netted from the dissolution would be invested in the joint-venture. According to 4B's Realty, Toscano represented that he intended to satisfy his initial capital contribution by investing in the joint-venture the full amount of the dissolution proceeds that he received from the Dissolution Action. For his part Toscano does not dispute that he agreed to reinvest his dissolution proceeds into the joint-venture, but rather claims that he agreed to invest either: (1) all of his dissolution proceeds less what he owed in taxes and debts, or (2) the portion of his dissolution proceeds remaining after taxes that may be necessary to satisfy any outstanding debt on his initial capital contribution. The latter is the position that he takes in the instant litigation.
On January 23, 2003, articles of organization were filed in the State of New York creating Southampton Brick & Tile, LLC. Consistent with their prior agreement, 4B's Realty then loaned Toscano $3,715,993.93 in capital to purchase the masonry and tile divisions at the auctions on behalf of SBT LLC. On January 31, 2003, SBT LLC purchased the masonry division and also purchased the tile division on February 13, 2003. The purchase involved Toscano, individually, bidding on the two divisions and subsequently assigning his "right, title, and interest" in the two divisions to SBT LLC in a Masonry Agreement and a Tile Agreement (the "Purchase Agreements"). In addition, Toscano contributed $500,000 on or about January 21, 2003, and $600,000 in or about February 2003 in association with the initial formation of SBT LLC.
Although Toscano and 4B's Realty considered themselves 50% owners of SBT LLC at the time it was created, the actual ownership interest was not codified in writing until May 2003. At that time, the parties executed the Operating Agreement of Southampton Brick & Tile, LLC ("Operating Agreement"). The Operating Agreement set forth the previous agreement of 4B's Realty and Toscano to each contribute 50% of SBT LLC's initial capital contribution in exchange for a 50% membership interest. The relevant portion of the Operating Agreement stated:
"6.01 Initial Capital Contributions. Each Member, upon the execution of this Operating Agreement, shall make as an initial Capital Contribution the amount shown on Exhibit A, which is attached hereto . . ."
"6.02 Additional Capital Contributions. No Member shall be required to make any Capital Contribution in addition to his initial Capital Contribution. The Initial Members . . . may make additional Capital Contributions to the Company with the consent of the Managers. . ."
(Livingston Decl., Ex. 6 at 9.) However, rather than include a monetary value for the initial capital contribution for each member, Exhibit A of the Operating Agreement simply listed Toscano and 4B's Realty as the members of SBT LLC and listed their "Capital Contributions Membership Interest" as "50%". (Id. at 21.) Despite the fact that 4B's Realty and Toscano had allegedly agreed that Toscano would invest some portion of his interest in the dissolution proceeds as a capital contribution, the Operating Agreement does not make any reference to the Dissolution Action or the dissolution proceeds.
On August 18, 2004, the court-appointed receiver in the Dissolution Action issued a Final Report and Accounting in connection *235 with the dissolution, which determined that SBT INC. retained $3,112,669.29 after distributions to its creditors.

B. The Assignment and Assumption Agreement
On November 1, 2004, Brown, Brodsky, and Toscano met to discuss SBT LLC. Toscano recalls that Kenneth Faltischek, Esq. ("Faltischek"), who was legal counsel for 4B's Realty at the time, was also present. Whereas Toscano had still been unable to satisfy his initial capital contribution as required by the Operating Agreement, between March 2003 and October 2004, 4B's Realty had invested an additional $1,700,000 in capital contributions to SBT LLC. According to Brodsky, at the November 1, 2004 meeting, he informed Toscano that 4B's Realty intended to discontinue making capital contributions to SBT LLC unless Toscano satisfied his initial capital contribution obligation. In particular, Brodsky stated that Toscano needed to sign the Assignment and Assumption Agreement (the "Assignment Agreement"), assigning to SBT LLC all of his interest in the dissolution proceeds. SBT LLC considered the Assignment Agreement to be the formalization of Toscano's agreement to assign his interest in the dissolution proceeds to SBT LLC as part of his initial capital contribution.
The Assignment Agreement was between SBT LLC and Toscano, and purported to assign Toscano's interests in the dissolution proceeds to SBT LLC in consideration for SBT LLC assuming Toscano's obligations under the Purchase Agreements for the masonry and tile divisions, and a 50% membership interest in SBT LLC. The relevant portion of the Assignment Agreement states:
WHEREAS, in consideration for the assumption of [Toscano's] obligations under the Masonry Agreement and Tile Agreement and the grant to [Toscano] of a 50% membership interest in [SBT LLC], [Toscano] agreed to assign all of his right, title, and interest in and to the proceeds of the Dissolution Action to [SBT LLC], which proceeds are approximately $2,750,000 as of the date hereof. NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:
1. Assignment. Assignor [Toscano] does hereby assign, transfer and convey outright and unconditionally to Assignee [SBT LLC] and its successors and assigns all of its right, title and interest in, to 100% of the proceeds of the Dissolution Action, including but not limited to all rights, powers, privileges, remedies and other benefits of Assignor under or in respect of the Dissolution Action.
(Livingston Decl., Ex. 7 at 1-2.)
For his part, Toscano characterizes Brodsky's conditions as coercive and threatening. However, Toscano does not dispute that he signed the Assignment Agreement on November 1, 2004, and states that he did so because he knew that if 4B's Realty discontinued funding SBT LLC operations, it would be "devastating to the company" and he would "lose [his] investment". (Toscano Dep. 193-195.) What Toscano does dispute, is what he was told about the Assignment Agreement prior to and after signing it. Here, Toscano has two somewhat seemingly inconsistent recollections of the facts. At his deposition, Toscano testified that he did not know that the document he signed involved the dissolution proceeds, and that he blindly signed the Assignment Agreement without discussing it or even reading it based on Brodsky's representation that he would never do anything to hurt him. (Toscano Dep. 111:22-114:10.) On the other *236 hand, in his affidavit submitted in opposition to the instant motion, Toscano states he signed the Assignment Agreement in part based on Brodsky's representation that the Assignment Agreement would "secure payment" of Toscano's "initial contribution only." (Toscano Aff. ¶ 12.)
Toscano was and still is represented by Richard Kraslow, Esq. ("Kraslow"), who was not present at the November 1, 2004 meeting. According to Toscano, although he requested an opportunity to have Kraslow review the Assignment Agreement before he signed it, Brodsky stated that it was not possible because the agreement had to be signed that day. Toscano testified at his deposition that "[a] considerable amount of time" passed before he had an opportunity to discuss the Assignment Agreement with his attorney. (Toscano Dep. 122:13-25.) Toscano does not define "considerable", and his deposition testimony does not provide any helpful clarification. Based on his deposition testimony, the amount of time that passed before he discussed the Assignment Agreement with his attorney ranged from "a week or so" after he signed the agreement when he told his attorney he felt coerced into signing it (Toscano Dep. 210:10-17), to three to four years after he signed the agreement when his attorney first showed him the document (Toscano Dep. 108:7-109:9.). According to Toscano, after he received a copy of the Assignment Agreement from Kraslow on an unspecified date, he informed Brodsky that he knew that he agreed to give SBT LLC his dissolution proceeds, but that he only agreed to give SBT LLC the full amount remaining after he paid his taxes and debts.
SBT LLC does not dispute that Toscano did not have independent counsel present at the November 1, 2004 meeting. However, SBT LLC contends that, based on Kraslow's time records, Kraslow discussed the "assignment of sales proceeds" with both Faltischek and Toscano on the day Toscano signed the agreement. (See Livingston Decl., Ex. 13.) The time records also reflect that Kraslow and Toscano discussed the assignment of sales proceeds on November 23, 2004, and that Kraslow received and discussed the "Assignment and Assumption Agreement" with Faltischek on November 29, 2004. (Id.) In addition, there is a letter from Faltischek to Kraslow dated November 24, 2004, transmitting the Assignment Agreement and describing it as an agreement "pursuant to which Angelo has assigned all of his right title and interest to the proceeds of the dissolution actions to Southampton Brick & Tile." (Docket # 23, Ex. 22.) Although Faltischek requests in the letter that Kraslow contact him if he has any "problems or questions", there is nothing in the record indicating that Kraslow ever contacted Faltischek with concerns regarding the Assignment Agreement.
In the time following the execution of the Assignment Agreement, both 4B's Realty and Toscano made additional contributions to SBT LLC. At some point Toscano and 4B's Realty began to discuss dividing SBT LLC. On about October 5, 2006, Toscano, Brodsky, and Brown met, with counsel present, to continue the negotiations for a division of SBT LLC. In conjunction with the potential division, SBT LLC's counsel prepared a proposed Redemption Agreement, which calculated Toscano's total capital contribution to SBT LLC as $2,696,131.37. This amount did not include Toscano's interest in the dissolution proceeds because the Dissolution Action was still pending. Although the Court is unclear of the precise circumstances, it would appear that at some point thereafter the business relationship between 4B's Realty and Toscano began to breakdown. As a result, as of July 2007, Toscano has not *237 had any involvement in the operations of SBT LLC.

C. Procedural History of the Disputes Over the Dissolution Proceeds
Turning back to the Dissolution Action, during a conference before the State court on February 28, 2007, Toscano and his brother Anthony Toscano entered into an oral stipulation that Anthony Toscano would be paid $300,000 from the dissolution proceeds with the remainder to be distributed to Angelo Toscano. However, the State court noted that the stipulation was of "inconclusive effect" at that time and the parties agreed that a formal agreement would be submitted to the court at a later date. Subsequently, SBT LLC moved to intervene in the Dissolution Action for the purpose of obtaining an order acknowledging SBT LLC's rights under the Assignment Agreement to 100% of Toscano's portion of the dissolution proceeds. On July 16, 2007, the State court granted SBT LLC's motion to intervene, and ordered that a court-appointed referee make a determination as to the respective shares of the parties that should ultimately be awarded from the surplus monies flowing from the dissolution of SBT INC.
On April 16, 2008, before the court-appointed referee could make this determination, the State court granted the United States Government leave to intervene in the Dissolution Action based on claims that the Government had undisputed tax liens against Toscano for the years 2000, 2001, 2002, and 2004, which, as of October 5, 2009, totaled $1,643,732.95 in federal tax liabilities. On May 15, 2008, the Government removed the Dissolution Action to federal court. In a written stipulation executed before this Court on August 27, 2008, it was ultimately agreed that Anthony Toscano would receive $300,000 from the dissolution proceeds with the remainder to be distributed to Angelo Toscano.
However, before Toscano could receive the funds, the Court needed to resolve the two outstanding disputes regarding who was entitled to the funds. The first was whether the Government was entitled to foreclose its tax liens on Toscano against his interest in the dissolution proceeds. SBT LLC opposed the Government's motion, arguing that SBT LLC's interest in the assignment of those proceeds was superior to the Government's tax liens. Toscano did not intervene personally in that action because Toscano "acknowledged his federal income tax liabilities, and supported the priority lien of the United States." (Toscano Aff. ¶ 8.) As stated above, in an order dated May 25, 2010, the Court held that the Government's tax liens had priority because the Assignment Agreement only granted SBT LLC an equitable lien on Toscano's interest in the Dissolution proceeds, which did not become choate until August 27, 2008. See Toscano I, 2010 WL 3174389, at * 5. As a result, the Court held that the Government was entitled to foreclose all of its tax liens on Toscano's interest in the dissolution proceeds in the amount of $1,643,732.95, plus statutory interest for a total of $1,739,891.33. As of June 30, 2010, Toscano's interest in the dissolution proceeds held by the court-appointed referee was $3,052,061.69. Although SBT LLC appealed the Court's decision in Toscano I, on April 28, 2011, SBT LLC and the Government subsequently entered into a stipulation whereby SBT LLC agreed to withdraw the appeal, and the Government agreed to modify the judgment by $360,000 less than the amount originally entered. As a result, on July 23, 2011 the Court entered a modified judgment in favor of the Government in the amount of $1,379,891.33.
*238 The remaining issue that requires resolution before the court-appointed receiver can distribute the dissolution proceeds is the controversy that is presently before this Court, namely, whether Toscano or SBT LLC is entitled to receive Toscano's remaining interest in the dissolution proceeds.
On September 20, 2010, SBT LLC moved for summary judgment pursuant to Fed.R.Civ.P. 56, seeking a determination that SBT LLC is the rightful owner of Toscano's remaining interest in the dissolution proceeds. According to SBT LLC, under the plain language of the Assignment Agreement, Toscano agreed to assign the entirety of his dissolution proceeds in exchange for a 50% ownership interest in SBT LLC and SBT LLC assuming all of Toscano's obligations under the Purchase Agreements. In opposition, Toscano contends that the Assignment Agreement is not a valid assignment of "all of his rights, title, and interest" in the Dissolution proceeds because 1) the agreement is ambiguous and the Operating Agreement and the intent of the parties demonstrates that the assignment was only to secure his initial capital contribution as defined in the Operating Agreement and 2) the agreement is void because 4B's Realty procured Toscano's signature through coercion, fraudulent inducement, and without adequate consideration.
Before proceeding with a discussion of the legal issues in this case, the Court notes that neither SBT LLC nor Toscano adequately explain whether the Assignment Agreement ought to be viewed as an independent agreement for a capital contribution, or whether it should be read as an amendment or other change to the Operating Agreement and Toscano's obligations under that agreement. SBT LLC implores the Court to view the Assignment Agreement as separate from the Operating Agreement when determining whether any of its provisions are ambiguous. However, SBT LLC also elsewhere characterizes the Assignment Agreement as a promissory note to satisfy Toscano's preexisting debt under the Operating Agreement, and states in its Rule 56.1 Statement and the Brodsky Affidavit that the Assignment Agreement was intended to satisfy Toscano's initial capital contribution obligation. Toscano, who alleges that he never read or even knew the contents of the Assignment Agreement, is equally inconsistent in his approach to how the Court should construe the Assignment Agreement.
The resolution of this issue involves a fact-intensive inquiry and credibility assessments that are improper in the resolution of a motion for summary judgment. However, the ultimate classification of the Assignment Agreement does not impact the issues before this Court, namely the validity and scope of the Assignment Agreement. Regardless of whether the Assignment Agreement is viewed as an independent agreement, or as an agreement related to or in satisfaction of Toscano's obligations under the Operating Agreement, the Court ultimately finds that the assignment was supported by adequate consideration and that there is no ambiguity with respect to Toscano's obligation to assign the entirety of his dissolution proceeds to SBT LLC.

II. DISCUSSION

A. Summary Judgment Standard of Review
Summary judgment under Fed.R.Civ.P. 56(c) is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. *239 R.Civ.P. 56(c). A fact is "material" within the meaning of Fed.R.Civ.P. 56 when its resolution "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995).
The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id.
Once the moving party has met its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotations omitted). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586, 106 S.Ct. 1348. Ultimately, summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir.1994). Because the court must ensure that no issues of material fact exist, "the court must independently search the record to determine if any issue of fact remains." Third Ave. Trust v. SunTrust Bank, 166 F.Supp.2d 783, 785 (S.D.N.Y.2001).

B. As to the Interpretation of the Assignment Agreement
Toscano contends that there are genuine issues of fact as to whether the Assignment Agreement does assign the entirety of his interest in the dissolution proceeds to SBT LLC without limitation. Toscano's challenge to the notion that the Assignment Agreement involves all of his interest in the dissolution proceeds centers on the phrase "initial capital contribution", which appears in the Operating Agreement but not in the Assignment Agreement.
According to Toscano, the phrase "initial capital contribution" has a set monetary value under the Operating Agreement and the Court should interpret the Assignment Agreement to only secure the amount of his initial capital contribution that remains due upon his receipt of the dissolution proceeds. Because the Operating Agreement does not include the monetary value of the "initial capital contribution", Toscano contends that there is a genuine issue of fact as to the monetary value of his initial capital contribution under the Operating Agreement, and whether his interest in the dissolution proceeds exceeds that amount. Toscano asserts that his interpretation is supported by: (1) parol evidence of the parties intention to limit the scope of the agreement, which Toscano contends is admissible in light of ambiguities in the Assignment Agreement; and (2) purportedly conflicting provisions in the *240 Operating Agreement and Assignment Agreement.
As an initial matter, the Court notes that the parties disagree as to whether the Court can consider the provisions of the Operating Agreement absent any ambiguity in the Assignment Agreement. However, the Court does not need to resolve this dispute because the Court ultimately finds that, even construing the two agreements together, they do not support Toscano's interpretation of the Assignment Agreement. The Court will address the purported ambiguity of the Assignment Agreement and the alleged conflicting provisions of the Operating Agreement separately.

1. Whether the Assignment Agreement is Ambiguous
It is well established that "the determination of whether a contract term is ambiguousand thus whether parol may be consideredis a threshold question of law for the court." Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 27 (2d Cir.1988). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." Brad H. v. City of New York, 17 N.Y.3d 180, 928 N.Y.S.2d 221, 951 N.E.2d 743 (2011). Summary judgment is appropriate in a contract interpretation dispute "when the language of the contract provision is wholly unambiguous" or "when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." Nycal Corp. v. Inoco PLC, 988 F.Supp. 296, 298-99 (S.D.N.Y.1997) (citing Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 115-16 (2d Cir.1994)). "The existence of ambiguity is determined by examining the `entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed,' with the wording to be considered `in the light of the obligation as a whole and the intention of the parties as manifested thereby'". Goldman Sachs Group, Inc. v. Almah LLC, 85 A.D.3d 424, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (quoting Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174) (1998) (alteration in original). In this regard, however, the writing between the parties is the best evidence of what the parties agreed upon and a "unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement . . . [is] not probative as an aid to the interpretation of the contract." Invista B.V. v. E.I. Du Pont De Nemours & Co., No. 07-CV-713, 2008 WL 4865044 at *4 (S.D.N.Y. Nov. 5, 2008) (quoting Murray Walter, Inc. v. Sarkisian Bros., Inc., 183 A.D.2d 140, 146, 589 N.Y.S.2d 613, 616 (3d Dep't 1992)).
The Court first looks to the face of the contract to determine whether it is ambiguous with regard to Toscano's obligations. Both the recital and operating provisions of the Assignment Agreement indicate Toscano's agreement to assign "all of his right, title, and interest" in the dissolution proceeds. Significantly, to the extent the word "all" was not clear enough, the operating provision further states that Toscano is agreeing to assign "100%" of his dissolution proceeds. Although the recitals portion includes an approximation of the value of the dissolution proceeds as of the date of signature, there is no language to suggest the assignment was limited to that amount or to anything less than the entire dissolution proceeds.
Toscano has not directed to the Court to any ambiguity in the agreement in the provisions relating to his obligations.
*241 Rather, Toscano argues that the Assignment Agreement is ambiguous because the portion of the agreement identifying SBT LLC's consideration "does not set forth the amount of [Toscano's] initial capital contribution or the equivalent value for [Toscano's] fifty (50%) percent membership interest in [SBT LLC]." (Toscano Br. at 10.) Because of this alleged ambiguity, Toscano states he should be able to submit parol evidence that he claims will show that SBT LLC cannot collect anything in excess of the initial capital contribution originally promised in the Operating Agreement. However, even if the value of the 50% membership interest was ambiguous, extrinsic evidence would only be permitted to resolve that ambiguity, which would have no bearing on the intentions of the parties or Toscano's obligations under the Assignment Agreement. Instead, such evidence would be admissible to show the monetary value and adequacy of SBT LLC's considerationan issue that the Court addresses later in this decision.
Toscano also contends that the failure of the Assignment Agreement to define his initial capital contribution renders it ambiguous because SBT LLC admits in its Rule 56.1 Statement and the Affidavit of Bert Brodsky ("Brodsky Affidavit") that the Assignment Agreement was intended to satisfy Toscano's "initial capital contribution". The parties seemingly attribute a different meaning to the phrase "initial capital contribution." Whereas Toscano would define "initial capital contribution" in terms of the monetary value at the time the parties entered into the Operating Agreement, SBT LLC appears to interpret "initial capital contribution" as the requirement to obtain a 50% membership interest in the company. Regardless, a difference in how the parties define the concept of Toscano's "initial capital contribution" is not equivalent to an ambiguity in the Assignment Agreement because the phrase "initial capital contribution" is simply not present in the Assignment Agreement.
Under New York law "[a] court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties." Riverside South Planning Corp. v. CRP/Extell Riverside, L.P., 60 A.D.3d 61, 66, 869 N.Y.S.2d 511, 516 (1st Dep't 2008). Indeed, the Second Circuit has cautioned that, in determining whether a contract is ambiguous a "court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." Federal Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 568 (2d Cir.2011) (quoting Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir.1990)).
There is no dispute that at the time the parties entered in to the Assignment Agreement Toscano had yet to satisfy his initial capital contribution obligation. Notably, although Toscano had invested approximately $1.1 million into SBT LLC in association with the purchase of the SBT INC. masonry and tile divisions, the Assignment Agreement does not refer to that amount, let alone indicate whether it should be deducted from the portion of the dissolution proceeds being assigned. There is simply no language limiting the scope of Toscano's assignment, and, as previously stated, the only reasonable interpretation of the word "all" and term "100%" is that Toscano agreed to assign the entirety of his dissolution proceeds without limitation. Again, where the language of the agreement is unambiguous on its face, the Court cannot look to extrinsic evidence, particularly where such evidence is offered to directly contradict the terms of the agreement. See Katel Ltd. Liab. *242 Co. v. AT & T Corp., 607 F.3d 60, 65 (2d Cir.2010) (affirming grant of summary judgment where inserting a word not present in an agreement would lead to an "illogical" result).
It is certainly possible that at the time the parties entered into the Assignment Agreement, "all" of Toscano's interest in the dissolution proceeds was equivalent to the monetary value of his initial capital contribution obligation under the Operating Agreement. In addition, Toscano may not have anticipated such a substantial delay in receiving the dissolution proceeds or the eventual breakdown in the relationship between himself and the members of 4B's Realty. However, the Court will not, in hindsight, insert terms into an otherwise unambiguous contract simply because of a change in circumstances. Because there is no evidence of ambiguity in the terms of the Assignment Agreement, the agreement must be construed in accordance with its plain language. As a result, SBT LLC is entitled to performance in accordance with the express terms of the Assignment Agreement.

2. Whether the Operating Agreement Requires Limiting Toscano's Assignment to an "Initial Capital Contribution"
The Operating Agreement provides that while, "[n]o member shall be required to make any Capital Contribution in addition to his initial Capital Contribution[, members] may make additional Capital Contributions to the Company with the consent of the Managers." (Livingston Decl., Ex. 6 at 9 (emphasis added).) Toscano contends that, if 100% of his interest in the dissolution proceeds exceeds the set monetary value of his initial capital contribution obligation as defined in the Operating Agreement, then the Assignment Agreement is contractually obligating him to make an additional capital contribution in exchange for his 50% membership interest. Because the Operating Agreement provides that no member shall be required to make additional capital contributions, Toscano asserts that the Assignment Agreement is limited by the Operating Agreement and therefore cannot secure anything more than what his initial capital contribution was intended to be under the Operating Agreement.
However, the Court finds that there is no conflict between the additional capital contribution provision of the Operating Agreement and the Assignment Agreement. Even assuming that Toscano's interest in the dissolution proceeds would constitute an additional capital contribution under the Operating Agreement, SBT LLC did not require Toscano to invest more than the initially agreed upon capital contribution in exchange for his 50% ownership. Rather, Toscano consented, in a signed writing, to an agreement stating that he assigned "all of his rights, title, and interest" in the dissolution proceeds without any restriction. Accordingly, the Court finds that there is no conflicting provision in the Operating Agreement that prevents the Court from fully enforcing the plain language of the Assignment Agreement.

C. As to the Validity of the Assignment Agreement
Toscano does not explicitly state the grounds on which he believes that the Assignment Agreement is void. From what the Court can gather, Toscano contends that: (1) he was under duress and coerced into signing the Assignment Agreement by Brodsky's threat that 4B's Realty would discontinue funding SBT LLC and (2) he was fraudulently induced to sign by Brodsky's misrepresentation that the Assignment Agreement would *243 only secure his initial capital contribution. The Court addresses these two contentions separately below. As a final matter with respect to the validity of the Assignment Agreement, the Court deems it prudent to address an issue alluded to by Toscano and discussed by SBT LLC, namely, whether the Assignment Agreement is invalid for lack of consideration.

1. Coercion and Duress
Toscano first alleges that he signed the Assignment Agreement "[a]s a result of the pressure, threats and coercion exacted by [Brodsky]". (Toscano Aff., ¶ 11.) "A claim of duress or coercion sufficient to vitiate a contract requires a showing of: `(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative.'" Intelligent Digital Sys., LLC v. Visual Mgmt. Sys. Inc., 736 F.Supp.2d 596, 601 (E.D.N.Y.2010) (quoting Kamerman v. Steinberg, 891 F.2d 424, 431 (2d Cir.1989)); see also 805 Third Ave. Co. v. M.W. Realty Associates, 58 N.Y.2d 447, 453, 461 N.Y.S.2d 778, 781, 448 N.E.2d 445, 448 (1983) ("[A] party cannot be guilty of economic duress for refusing to do that which it is not legally required to do.").
Here, 4B's Realty's condition that it would discontinue funding SBT LLC's operations unless Toscano signed the Assignment Agreement does not constitute an "unlawful threat" sufficient to state a claim for invalidating an agreement based on coercion or duress. As Toscano himself notes, the Operating Agreement does not require 4B's Realty or Toscano to invest any capital in SBT LLC beyond their initial capital contribution. Toscano also does not dispute that, as of November 1, 2004, 4B's Realty had satisfied its initial capital contribution requirement. Accordingly, Toscano's assertion that he only signed the Assignment Agreement because of Brodsky's "threats" that 4B's Realty would stop making additional capital contributions into SBT LLCwhich it is within its rights to do under the Operating Agreementcannot legally constitute coercion.
Nevertheless, even if Toscano had been able to raise a genuine issue of material fact as to whether he was under duress when he entered into the Assignment Agreement without reading it, his subsequent acceptance of the benefits ratified its terms and precludes him from seeking to invalidate the agreement on the grounds of duress.
"Ratification is the express or implied adoption, i.e., recognition and approval, of the unauthorized acts of another." Orix Credit Alliance v. Phillips-Mahnen, Inc., No. 89-CV-8376, 1993 WL 183766, at *4 (S.D.N.Y. May 26, 1993). "Ratification can ... occur through `intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it.'" In re MarketXT Holdings Corp., 361 B.R. 369, 402 (Bankr.S.D.N.Y.2007) (quoting VKK Corp. v. Nat'l Football League, 244 F.3d 114, 123 (2d Cir.2001)). "A party seeking to cancel a contract on the basis of duress must do so promptly or they will be deemed to have ratified the contract." Rockmore v. Antell, No. 07-CV3592, 2008 WL 4443951, at *4 (S.D.N.Y. Sept. 25, 2008) (citing 110 Sand Co. v. Nassau Land Imp. Co., Inc., 7 A.D.3d 497, 498, 775 N.Y.S.2d 578, 579 (2d Dep't 2004)). "The burden on a party seeking to avoid contractual obligations on the grounds of economic duress `increases proportionately with the delay in initiating suit or otherwise repudiating the contract *244 in question'". Id. (quoting VKK Corp., 244 F.3d at 123).
Viewing the record as a whole, there is no genuine issue of fact as to whether Toscano ratified the Assignment Agreement. At his deposition, Toscano testified that "a week or so" after signing the Assignment Agreement, he told his attorney that he felt coerced into signing it. (Toscano Dep. 210: 3-17.) However, Toscano contends that he did not complain to either principal of 4B's Realty because he felt "embarrassed" by the circumstances because he allowed "them to bully [him]". (Toscano Dep. 211:2-24.) Toscano's testimony that he acquiesced to the agreement despite feeling coerced because he was embarrassed by the events of November 1, 2004 does not excuse his failure to object.
Ultimately, Toscano affirmatively chose not to repudiate the agreement, but rather to accept the benefit of 4B's Realty's continued capital contribution and his 50% membership interest in SBT LLC. As the Second Circuit explained in VKK Corp.:
The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to undo it.
244 F.3d at 123. Accordingly, Toscano not only has failed to state a claim for duress, but even assuming he had, his failure to repudiate in a timely manner and subsequent acceptance of the benefits waived his right to invalidate the Assignment Agreement on the basis of duress.

2. Fraudulent Inducement
Toscano further claims that he was fraudulently induced into executing the Assignment Agreement "based upon the repeated representations of Bert Brodsky that he would "never do anything to hurt [him]", and that the [Assignment Agreement] would secure payment of [Toscano's] initial contribution only" (Toscano Aff. ¶ 12.) Toscano contends it was reasonable for him to rely on Brodsky's statements because neither he nor his attorney had an opportunity to read or review the agreement prior to signing it.
In order to defeat the motion for summary judgment on grounds of fraudulent inducement, Toscano must raise a genuine issue of material fact as to whether he "reasonably relied on false representations" made by Brodsky. Fax Telecommunicaciones Inc. v. AT & T, 138 F.3d 479, 490 (2d Cir.1998). "[R]easonable reliance is an essential element of fraudulent inducement." Psenicska v. Twentieth Century Fox Film Corp., 409 Fed.Appx. 368, 371 (2d Cir.2009). Under New York law, where "the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." Continental Airlines, Inc. v. Lelakis, 129 F.3d 113 (Table), 1997 WL 701363, at *3 (2d Cir. Nov. 10, 1997) (quoting Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 603, 157 N.E.2d 597 (1959)).
Here, Toscano had the means available to know that the Assignment Agreement was not limited to his initial capital contribution under the Operating Agreement, namely, he had the Assignment Agreement. *245 As previously noted, this document unambiguously states that Toscano is agreeing to assign "all of his rights, title, and interest" in the dissolution proceeds without any limitation excepting amounts that Toscano previously or subsequently contributed. However, Toscano contends that he should not be bound by the Assignment Agreement's terms because neither he nor his attorney had an opportunity to review it before it was signed.
Generally, "a party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a document on the ground that he or she did not read it or know its contents". Scott v. Fields, 85 A.D.3d 756, 925 N.Y.S.2d 135, 138 (2d Dep't 2011) (internal quotation marks omitted). However, a failure to read or review an agreement before signing it can serve as a valid basis to void a contract where "the signer was unaware of the nature of the instrument he or she was signing such as where the signer is illiterate, or blind, or ignorant of the alien language of the writing, and the contents thereof are misread or misrepresented to him by the other party, or even by a stranger". Cash v. Titan Fin. Servs., Inc., 58 A.D.3d 785, 788, 873 N.Y.S.2d 642, 645 (2d Dep't 2009) (internal quotation marks omitted). Although allegations of fraud and duress can also excuse a failure to read an agreement prior to signing, Toscano has not alleged fraud in the execution of the contract, and, as previously discussed, cannot state a claim for duress. See Overseas Private Inv. Corp. v. Kim, 69 A.D.3d 1185, 895 N.Y.S.2d 217 (3d Dep't 2010) ("[I]n the absence of fraud, duress or some other wrongful act by a party to a contract, a signer of an agreement is deemed to be conclusively bound by its terms whether or not he or she read it".) (quoting Maines Paper & Food Serv. v. Adel, 256 A.D.2d 760, 761, 681 N.Y.S.2d 390, 390 (3d Dep't 1998)).
According to Toscano, Brodsky handed the three page Assignment Agreement to him already open to the signature page. When Toscano asked if he could bring it to his attorney to review before he signed it, Brodsky allegedly denied him the opportunity to do so by stating that the agreement had to be signed that day. It is unclear whether Toscano directly asked about the subject matter of the agreement, but he claims he did not know that it involved his dissolution proceeds. Absent from the record, however, is any evidence supporting Toscano's conclusory allegation that he did not have an "opportunity to review" the agreement, or any other evidence suggesting that Toscano was impaired or otherwise personally prevented from reading the Assignment Agreement.
Although Toscano contends that it is improper on summary judgment for the Court to make credibility determinations or adhere to its previous finding that he was a sophisticated businessman, the Court does not need to do either to reject Toscano's fraudulent inducement claim. Toscano has not presented any evidence suggesting he is not a sophisticated businessman and therefore there is no need for the Court to make a credibility assessment. On the record before the Court, Toscano does not contend that he was illiterate, blind, or ignorant of the language in the agreement. To the contrary, Toscano was vice-president of SBT INC. from 1975 until 2002, and actively involved in the management of SBT LLC. Accordingly, Toscano is properly classified and held to the standards expected of a sophisticated businessman.
Accepting Toscano's version of the facts, he not only failed to read and review the Assignment Agreement at the time he *246 signed it, but he did not discuss the agreement with his lawyer or review the agreement until a "considerable amount of time later". This is particularly troubling in light of his admission that he informed his attorney "a week or so later" that he felt coerced into signing the agreementan agreement that, allegedly, he did not know the contents of, and which he did not subsequently attempt to learn what the agreement provided.
As the Court has already stated, there is simply no ambiguity in the four corners of the Assignment Agreement. Toscano admits that, prior to signing the Assignment Agreement, the parties had discussed that he would give the dissolution proceeds to SBT LLC as a capital contribution. Had Toscano read the Assignment Agreement, he would have seen that there was no reference to an "initial capital contribution" and that he was assigning "all of his rights, title and interest", also stated as "100%" of his dissolution proceeds without any limitation.
Although Toscano claims that he felt pressured by the circumstances and the risk of 4B's Realty discontinuing the funding of SBT LLC's operations, it does not relieve him of his "basic responsibility . . . to review a document before signing it." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 34 (2d Cir.1997); Ecoline, Inc. v. Local Union No. 12 of Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers, AFL-CIO, 271 Fed.Appx. 70, 71-72 (2d Cir.2008) ("In general, individuals are charged with knowledge of the contents of documents they sign and a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms.") (internal quotation marks omitted). As the Second Circuit has stated, "a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir.2003) (quoting Rodas v. Manitaras, 159 A.D.2d 341, 343, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)). Toscano could have declined to sign the Assignment Agreement without first having his attorney review it. However, he chose to sign the document without reading it, in order to ensure the viability of SBT LLC and protect his investment in SBT LLC. Absent a justifiable excuse for a failure to read the document, for Toscano "not to have read [the Assignment Agreement] was gross negligence" and his apparent decision "not to procure it to be read was equally negligent". Continental, 1997 WL 701363, at *3 (quoting Pimpinello v. Swift & Co., 253 N.Y. 159, 162-63, 170 N.E. 530 (1930)). The law is clear that "in either case the writing binds him". Id. Accordingly, the Court will not invalidate the Assignment Agreement on the ground of fraudulent inducement.

3. Consideration
In Toscano I, the Court stated that "[t]here is no question in this case that SBT LLC offered valid consideration for the [Assignment Agreement]." Toscano I, 2010 WL 3174389, at *3. As a result, SBT LLC contends that Toscano is collaterally estopped from arguing otherwise. In addition, because Toscano did not respond to SBT LLC's Rule 56.1 Statement, it contends that Toscano has admitted, by his silence, that consideration was adequate. For his part, Toscano disputes that the Court is bound by its statement in Toscano I regarding the adequacy of consideration. However, while Toscano alludes to the possibility that the Assignment Agreement is not supported by consideration, he does not put forth any arguments or point to any evidence in the record challenging the adequacy of either his or SBT LLC's *247 consideration. Indeed, Toscano's only direct challenge to the adequacy of consideration is an argument that 4B's Realty's pre-November 1, 2004 capital contributions could not be considered adequate consideration for the Assignment Agreement.
Nevertheless, as stated above, a Court should not grant summary judgment unless it is satisfied on the record before it that there is no genuine issue of material fact. As set forth below, the record in this case reveals that regardless of whether the Assignment Agreement is construed with the Operating Agreement or characterized as an independent agreement, the Assignment Agreement is supported by adequate consideration and is therefore a valid and enforceable contract. Accordingly, because this case can be decided on the merits, the Court does not need to determine whether it is bound by its previous statement in Toscano I or Toscano's failure to reply to SBT LLC's Rule 56.1 Statement.

a. As to the Adequacy of Consideration When the Assignment Agreement and Operating Agreement are Construed Together
When considered with the Operating Agreement, a lack of additional consideration will not invalidate the Assignment Agreement. Regardless of whether the Assignment Agreement is construed as: (1) the satisfaction of Toscano's preexisting debt under the Operating Agreement; (2) part of the same transaction as the Operating Agreement; or (3) a modification of Toscano's initial capital contribution under the Operating Agreement, the Court finds that a lack of additional consideration will not invalidate the contract.
It is undisputed that as of November 1, 2004, Toscano had yet to satisfy his initial capital contribution. Accordingly, in its reply brief, SBT LLC characterizes the Assignment Agreement as a type of promissory note executed to satisfy Toscano's preexisting debt obligation under the Operating Agreement. New York Uniform Commercial Code ("N.Y.U.C.C.") § 3-408 provides that, "no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind." Thus, to the extent that Toscano executed the Assignment Agreement as a promissory note to satisfy his existing initial capital contribution obligation, new consideration was not required. See Cohan v. Movtady, 751 F.Supp.2d 436, 441-42 (E.D.N.Y.2010); Orix Fin. Servs., Inc. v. Thunder Ridge Energy, Inc., No. 01-CV-4788, 2006 WL 587483, at *14 (S.D.N.Y. March 8, 2006); Sun Forest Corp. v. Shvili, 152 F.Supp.2d 367, 391-92 (S.D.N.Y.2001). This is true regardless of whether "the amount due on the note is not supported by consideration equal to the amount of an antecedent obligation." Sun Forest, 152 F.Supp.2d at 391. Accordingly, even if Toscano's dissolution proceeds are less than or in excess of the monetary value of his initial capital contribution under the Operating Agreement, the assignment would still be valid and enforceable under New York Law.
Furthermore, in addition to asserting that the Assignment Agreement is wholly independent of the Operating Agreement, or was a promissory note to satisfy Toscano's existing debt under the Operating Agreement, SBT LLC also describes the Assignment Agreement as the codification of Toscano's promise that he would give SBT LLC his interest in the dissolution proceeds to satisfy his initial capital contribution. If true, then the Assignment Agreement and the Operating Agreement would be part of the same transaction and no additional consideration would be required for the agreement to be valid and enforceable under New York Law. See Liberty Nat. Bank v. Gross, 201 A.D.2d *248 467, 468, 607 N.Y.S.2d 419, 420 (2d Dep't 1994) ("It is clear that the guarantee was given in order to induce the Bank to agree to a modification of the terms of the original promissory note. Although the two documents may not have been executed on the same date, they were clearly part of the same transaction, and there was no need for new or additional consideration to make the guarantee valid and enforceable under . . . New York [law]").
Finally, to the extent the Assignment Agreement constituted a modification of Toscano's initial capital contribution, both the provisions of the Operating Agreement and New York law permit this type of modification without additional consideration. Section 21.01 of the Operating Agreement provides that the Operating Agreement may be modified "by an agreement in writing signed by the party against whom enforcements of any waiver, change, modification or discharge is sought." (Operating Agreement, § 21.01).
Moreover, any potential objection to the modification for lack of consideration cannot be sustained under New York law. Pursuant to New York General Obligation Law § 5-1103, "[a]n agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any contract. . . shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract. . . shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent." This section "removes the need for consideration for a change or modification of a contract, provided that the modifying agreement is in writing and signed by the party against whom enforcement is sought...." Scientific Holding Co. v. Plessey, Inc., 510 F.2d 15, 21 (2d Cir.1974); see also GG Managers, Inc. v. Fidata Trust Co. New York, 215 A.D.2d 241, 241-42, 626 N.Y.S.2d 488 (1st Dep't 1995) ("A written, signed agreement to discharge or modify an existing obligation is not rendered invalid because of the absence of consideration"). Here, the Assignment Agreement satisfies the requirements under the Operating Agreement and under New York law for a valid modification, namely that it is a signed writing by the individual against whom the modification is being enforced.
Thus, assuming the Assignment Agreement and Operating Agreement are construed together, there is no issue of material fact sufficient to defeat a motion for summary judgment with regard to the adequacy of consideration.

b. As to the Adequacy of Consideration When the Assignment Agreement is Construed as an Independent Contract
"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir.2004) (quotation marks omitted). "Under New York law, `[m]utual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance.'" Id. (quoting Maffea v. Ippolito, 247 A.D.2d 366, 367, 668 N.Y.S.2d 653, 654 (2d Dep't 1998)).
"Consideration is defined as `some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other.'" In re GII Industries, Inc., 416 B.R. 84, 90 (Bankr. E.D.N.Y.2009) (quoting Hamer v. Sidway, 124 N.Y. 538, 545, 27 N.E. 256 (1891)). An agreement is not supported by valid consideration "[i]f the promisor loses nothing, and the promisee acquires nothing." Granite Partners, L.P. v. Bear, Stearns & *249 Co., 58 F.Supp.2d 228, 252 (S.D.N.Y.1999). "It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him." Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 464, 457 N.Y.S.2d 193, 196, 443 N.E.2d 441, 444 (2d Dep't 1982) (quotation marks omitted). "Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial as long as it is acceptable to the promisee." Id., 57 N.Y.2d at 464, 457 N.Y.S.2d at 197, 443 N.E.2d at 445.
It is a well established principle of contract law that "the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." Apfel v. Prudential-Bache Sec., 81 N.Y.2d 470, 475, 600 N.Y.S.2d 433, 435, 616 N.E.2d 1095, 1097 (1993). "Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny. It is enough that something of `real value in the eye of the law' was exchanged." Id., 81 N.Y.2d at 476, 600 N.Y.S.2d at 435, 616 N.E.2d at 1097.
Toscano did not have a preexisting contractual obligation to make an additional capital contribution, and as previously discussed, was not contractually barred from agreeing to make an additional capital contribution. In addition, although both parties admit to a preexisting agreement that Toscano would assign some portion of his dissolution proceeds to SBT LLC as a capital contribution, Toscano did not have a preexisting contractual obligation to assign his dissolution proceeds to satisfy his initial capital contribution obligation. With regard to SBT LLC's consideration as stated in the plain language of the Assignment Agreement, SBT LLC was already under a preexisting contractual duty to assume Toscano's obligations under the Purchase Agreements, and to grant Toscano a 50% membership interest pursuant to the Operating Agreement.
Generally, a promise to carry out a preexisting contractual obligation is not sufficient consideration. See Ferguson v. Lion Holdings, Inc., 312 F.Supp.2d 484, 494 (S.D.N.Y.2004). However, where there is a question of mutual assent, the Court may look outside the four corners of the agreement because "[t]he manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." Register.com, 356 F.3d at 427 (quotation marks omitted); see also Nat'l Credit Sys., Inc. v. Veterinary Emergency Ctr., P.C., 11 Misc.3d 1060(A), 815 N.Y.S.2d 495 (Table), 2006 WL 550658, at *2 (N.Y.City Civ.Ct. Feb. 27, 2006) ("[T]he validity of a written contract is not contingent upon the express inclusion of consideration, consideration may be implied, or proven through parole evidence.") (citing Richman v. Brookhaven Servicing Corp., 80 Misc.2d 563, 363 N.Y.S.2d 731 (Dist. Ct., Suffolk County 1975); Anonymous v. Anonymous, 2 Misc.3d 1002(A), 2004 WL 396492 (Sup. Ct. N.Y. County 2004)).
As an initial matter, Toscano alleges without explanation that the Assignment Agreement lacked consideration based on a statement in SBT LLC's brief that 4B's Realty made its additional capital contributions to SBT LLC between March 2004 and October 2004 "in consideration for Angelo Toscano's agreement to assign his rights to the dissolution proceeds." (SBT LLC Br. at 5 (emphasis added).) Toscano seized on the emphasized language to state that 4B's Realty's additional contributions before November 1, 2004 could not have been made "in consideration for" his assignment of the Dissolution *250 proceeds because he did not sign the Assignment Agreement until November 1, 2004. As a result, Toscano appears to argue that the Assignment Agreement is invalid because there was no consideration for his agreement to sign it. Even assuming Toscano correctly interprets SBT LLC's statement, the Court does not see the relevance of this argument. The record is clear that the circumstances surrounding the execution of Assignment Agreement involved 4B's Realty's willingness to make future additional capital contributionswhich 4B's Realty made and Toscano acceptedand not its past contributions.
Although he classifies the condition as a threat, Toscano nevertheless admits that he signed the Assignment Agreement in order to ensure that 4B's Realty would continue to fund SBT LLC's operations. As the record reflects, Toscano recognized the benefit in 4B's Realty's promise to continue funding SBT LLC's operations, not only to the company, but also to his own personal investment. Moreover, there is no dispute that 4B's Realty made the promised additional capital contributions after November 1, 2004, and that Toscano, as a 50% owner of SBT LLC, reaped the benefits of that investment. The capital contributions of the parties are disputed in the record, but are immaterial to the determination of whether there was adequate consideration in this case. Because the adequacy of consideration is a matter for the parties to determine upon striking their bargain and Toscano recognized the benefits of the bargain that he entered into, he cannot claim that there was no consideration in the Assignment Agreement.
Accordingly, there is simply no dispute that Toscano agreed to assign all of his dissolution proceeds without limitation regardless of whether the Assignment Agreement was intended to be part of the same transaction as the Operating Agreement; or a modification of the Operating Agreement; or to secure his preexisting debt under the Operating Agreement; or an independent agreement to either satisfy Toscano's initial capital contribution or serve as an additional capital contribution to SBT LLC in exchange for 4B's Realty's continued funding. Therefore, Toscano has failed to raise an issue of fact as to the validity of the Assignment Agreement for lack of consideration and SBT LLC is entitled to summary judgment.

III. CONCLUSION

As a result it is hereby,
ORDERED, that the SBT's motion for summary judgment seeking a declaration that it is entitled to all of Toscano's rights, title, and interest in the dissolution proceeds pursuant to the Assignment Agreement is granted.
SO ORDERED.