# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BOREALIS POWER HOLDINGS INC. )
and BPC HEALTH CORPORATION, )
)
       Plaintiffs, )
)
   v. )
)
HUNT STRATEGIC UTILITY )
INVESTMENT, L.L.C., )
)
       Defendant. )
_____ )
SEMPRA TEXAS HOLDINGS CORP., )
and SEMPRA TEXAS )
INTERMEDIATE HOLDING )
COMPANY LLC, )
)
       Plaintiff Intervenors, )
)
   v. ) C.A. No. 2019-0582-SG
)
BOREALIS POWER HOLDINGS INC., )
BPC HEALTH CORPORATION, )
TEXAS TRANSMISSION )
INVESTMENT LLC, and HUNT )
STRATEGIC UTILITY INVESTMENT )
L.L.C., )
)
       Defendants. )
_____ )
CHEYNE WALK INVESTMENT PTE )
LTD, )
       Plaintiff Intervenors, )
)
   v. )
)
HUNT STRATEGIC UTILITY )
INVESTMENT, L.L.C., SEMPRA )

**MEMORANDUM OPINION**

Date Submitted:  December 20, 2019
Date Decided:  January 22, 2020

William M. Lafferty, Thomas W. Briggs, Jr., Daniel T. Menken, and Aubrey J. Morin, of MORRIS NICHOLS ARSHT & TUNNEL LLP, Wilmington, Delaware; OF COUNSEL: Richard I. Werder, Jr., Renita N. Sharma, Elisabeth B. Miller, and Ryan A. Rakower, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for* Plaintiffs and Defendants Borealis Power Holdings Inc. and BPC Health Corporation.

Blake Rohrbacher, Brian S. Yu, and Kevin M. Regan, of RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; OF COUNSEL: Neil A. Steiner, of DECHERT LLP, New York, New York, *Attorneys for* Plaintiff Intervenors Cheyne Walk Investments Pte Ltd.

David C. McBride, Martin S. Lessner, Ryan M. Bartley, and Paul J. Loughman, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: J. Christopher Shore and Alive Tsier, of WHITE & CASE LLP, New York, New York; Aaron Colodny, of WHITE & CASE LLP, Los Angeles, California, *Attorneys for* Plaintiff Intervenors and Defendants Sempra Texas Holdings Corp. and Sempra Texas Intermediate Holding Company, LLC.

Peter J. Walsh, Jr., J. Matthew Belger, and Andrew H. Sauder, of POTTER ANDERSON & CARROON LLP, Wilmington, Delaware; OF COUNSEL: Jessica B. Pulliam, of BAKER BOTTS LLP, Dallas, Texas; Vernon Cassin, of BAKER BOTTS LLP, Washington, D.C, *Attorneys for* Defendant Hunt Strategic Utility Investment, LLC.

P. Clarkson Collins, Jr., Ian D. McCauley, and Kathleen A. Murphy, of MORRIS JAMES LLP, Wilmington, Delaware, *Attorneys for* Defendant Texas Transmission Investment LLC.

GLASSCOCK, Vice Chancellor

This post-trial Memorandum Opinion resolves a discrete set of contractual issues. Defendant Hunt Strategic Utility Investment, L.L.C. ("Hunt") owns one percent of the shares in a utility holding company. It wishes to sell that investment. It believes that its right to do so is subject, contractually, to what amounts to two conflicting rights of first refusal; one in favor of two affiliated parties here—Borealis Power Holdings, Inc. and BPC Health Corporation (together, "Borealis")—and another in favor of intervenor Sempra Texas Holdings Corp. ("STH"). Borealis wishes to vindicate its right and purchase Hunt's interest. So does STH. As a result, while Hunt is the Defendant, its position resembles the plaintiff in an interpleader action; it will sell to whichever entity the Court finds to have superior contractual rights to purchase its interest.

The resulting contractual inquiry required the examination of two complex and inter-related contractual schemes, to determine the parties' intentions with respect to the proposed transaction here. Readers of this Memorandum Opinion will find the resolution of those contractual issues challenging but comprehensible, I assume, as did I. Far more laborious will be comprehending the convoluted relationship among the many contracting entities, a necessary preliminary to a reasoned resolution of the contractual issues just referenced. Considerations of investors in the underlying utility—including satisfaction of regulators, preservation

of entity creditworthiness, and tax avoidance—have resulted in an ownership structure of Byzantine complexity, set out in eye-watering detail below.

Have traversed these entity and contractual badlands, I determine that STH's preclusive purchase rights are superior to that of Borealis. My reasoning follows the aforementioned footsore factual recitation, below.

## I. BACKGROUND[1]

This is a post-trial Memorandum Opinion. The following facts were stipulated by the parties or proven by a preponderance of evidence at trial.

*A. The Parties and Relevant Non-Parties*

Figure "A", attached at the end of this Memorandum Opinion, graphically represents the relationship of the contracting entities discussed below.

Non-party Oncor Electric Delivery Company LLC ("Oncor") is a Delaware limited liability company headquartered in Dallas, Texas.[2] Oncor is an electric utility company operating the largest transmission and distribution system in Texas.[3] Oncor delivers electricity to more than 3.6 million homes and businesses and operates more than 138,500 miles of transmission and distribution lines.[4]

---

[1] Citations to Joint Trial Exhibits ("JX") are expressed as JX __, at __. Page numbers for JXs are derived from the stamp on each JX page, expressed in the form of JX 000.000. For clarity, certain citations to JXs reference the section number of a document (§) instead of the JX page. Citations in the form "Tr." refer to the trial transcript.

[2] Pretrial Stipulation and Order, D.I. 226 ("PTSO"), ¶ 3.

[3] *Id.*

[4] *Id.*

Defendant Texas Transmission Investment LLC ("TTI") is a Delaware limited liability company.[5] TTI directly owns 19.75% of Oncor.[6] TTI is 100% owned by non-party Texas Transmission Finco LLC ("TTFinco"), a Delaware limited liability company.[7] TTFinco is, in turn, 100% owned by non-party Texas Transmission Holding Corporation ("TTHC"), a Delaware corporation.[8]

Litigants Borealis Power Holdings, Inc. and BPC Health Corporation— defined above jointly as Borealis—are Ontario corporations headquartered in Toronto, Ontario.[9] Borealis collectively owns 49.5% of TTHC.[10] Borealis' ultimate parent is non-party Ontario Municipal Employee Retirement System ("OMERS").[11] OMERS is a statutorily-created pension fund that handles the retirement benefits for the government employees of Ontario, Canada.[12] OMERS has approximately $100 billion Canadian dollars of assets under management.[13]

Plaintiff Intervenor Cheyne Walk Investment Pte Ltd. ("Cheyne Walk") is a Singaporean private limited company headquartered in Singapore.[14] Cheyne Walk

---

[5] *Id.* ¶ 4.
[6] *Id.* ¶ 3; JX 70, at 46.
[7] PTSO, ¶ 5.
[8] *Id.* ¶ 6.
[9] *Id.* ¶ 7.
[10] *Id.* Due to the convoluted nature of this litigation, I refer to all parties with multiple titles as "Litigants"—the precise titles of such parties can be found in the case caption.
[11] *Id.* ¶ 13.
[12] *Id.*
[13] Trial Tr. 444:22–445:1 (Zucchet).
[14] PTSO, ¶ 8.

3

owns 49.5% of TTHC.[15]   Cheyne Walk is managed and controlled by a wholly-owned subsidiary of non-party GIC Private Limited ("GIC"), a Singaporean private limited company headquartered in Singapore.[16]  GIC is a sovereign wealth fund that manages assets on behalf of Singapore's government, and currently has over $100 billion of assets under management.[17]

Defendant Hunt is a Delaware limited liability company headquartered in Texas.[18]  Hunt owns 1% of TTHC and holds no other assets.[19]  Hunt's ultimate parent is non-party Hunt Consolidated, Inc. ("Hunt Consolidated"), a privately held Delaware corporation headquartered in Dallas, Texas.[20]   Hunt Consolidated is engaged in a variety of businesses.[21]

Non-party Oncor Electric Delivery Holding Company, LLC ("Oncor Holdings") is a Delaware limited liability company.[22]  Oncor Holdings directly owns 80.25% of Oncor.[23]   Litigant Sempra Texas Intermediate Holding Company

---

[15] *Id.*
[16] *Id.* ¶ 14.
[17] Trial Tr. 347:14–348:12 (Baldwin).
[18] PTSO, ¶ 8.
[19] *Id.* ¶ 9; Trial Tr. 188:6–188:9 (Hernandez).
[20] PTSO, ¶ 16.  It is sometimes unclear from the record which Hunt Consolidated-affiliated entity is being referred to; thus, Hunt is also used herein to refer to any entity under the Hunt Consolidated umbrella (including the Hunt Defendant here).
[21] Trial Tr. 141:1–141:8 (Hernandez) ("[Hunt Consolidated is] a privately owned company that is in a variety of businesses, principally energy-related, oil and gas, LNG, electric, power transmission and distribution assets.  We also have an investment portfolio, an agriculture business, and a real estate business.").
[22] PTSO, ¶ 10.
[23] *Id.*; JX 70, at 46.

4

("STIH") is a Delaware limited liability company and was formerly known as Energy Future Intermediate Holding Company LLC ("EFIH").[24] STIH owns 100% of Oncor Holdings.[25] STIH is 100% owned by Litigant STH, a Texas corporation.[26] STH was formerly known as Energy Future Holdings Corp. ("EFH").[27] STIH and STH's ultimate parent is Sempra Energy ("Sempra"), a California corporation.[28] Sempra is a publicly-traded energy infrastructure holding company headquartered in San Diego, California with a market capitalization of approximately $40 billion.[29] Sempra holds energy infrastructure investments in California, Texas, Mexico, and South America.[30]

*B. Origin of Oncor's Current Ownership Structure*

On October 10, 2007, KKR & Co Inc., Texas Pacific Group, and Goldman Sachs Capital Partners executed a $45 billion leveraged buyout ("LBO") of TXU Corp.; TXU Corp. was subsequently renamed EFH.[31] The transaction was the largest LBO in history.[32] Post-closing, EFH, an energy company, was structurally divided into two parts. EFH's unregulated businesses were held by Texas

---

[24] PTSO, ¶ 11.
[25] *Id.*
[26] *Id.* ¶ 12.
[27] *Id.*
[28] *Id.* ¶ 15.
[29] *Id.*; Trial Tr. 11:1–11:6 (Mihalik).
[30] PTSO, ¶ 15.
[31] *Id.* ¶ 17.
[32] Trial Tr. 143:6–143:7 (Hernandez).

Competitive Electric Holdings Company LLC, EFH's indirect wholly-owned subsidiary.[33] The regulated side of the business, represented by Oncor, was held through EFH's subsidiaries EFIH and Oncor Holdings.[34] At the time of the LBO, Oncor was (and continues to be) regulated by the Public Utility Commission of Texas ("PUCT").[35]

After the LBO closed, EFH sought to "ring-fence" Oncor from the rest of its business to preserve Oncor's credit quality.[36] The structure—Oncor Holdings as a bankruptcy-remote entity to hold EFH's equity interest in Oncor—created a "'clean' legal and structural separation between Oncor . . . and EFH and its subsidiaries."[37] However, credit rating agencies conveyed in discussions with EFH that ring-fencing Oncor from a legal perspective was insufficient to decouple Oncor from the EFH corporate family credit rating.[38] This was significant because, due to the amount of debt incurred by EFH as part of the LBO, EFH's own credit ratings were downgraded.[39] This created a threat that Oncor itself could be downgraded.[40] The

---

[33] JX 1, at 4, 7. Texas Competitive Electric Holdings Company LLC consisted of two "functionally separate energy businesses," Lumiant—which had 18,365 MW of generation in Texas—and TXU Energy, the then-largest retail electric provider in Texas. *Id.* at 4.

[34] JX 1, at 7; Trial Tr. 225:7–225:9 (Horton).

[35] JX 20, at 3; JX 69, at 3.

[36] JX 1, at 32.

[37] *Id.*

[38] Trial Tr. 225:10–225:19 (Horton).

[39] JX 20, at 5.

[40] Trial Tr. 226:12–226:14 (Horton); JX 20, at 5. Anthony Horton, former Executive Vice President and CFO of EFH, testified as to two business consequences to EFH if Oncor was downgraded: (1) "TXU Energy, our unregulated retail business, would have had to post collateral to Oncor" and (2) "[Oncor] would have certainly been in a situation where that would have been

credit rating agencies signaled that if EFH sold "somewhere between 19 to 20 percent" of Oncor, the agencies would consider decoupling Oncor from EFH's family credit ratings and rating Oncor independently on its own financial metrics.[41] EFH thus sought bids for up to 20% of the membership interests in Oncor.[42]

On January 28, 2008, Borealis and GIC Special Investments submitted separate written non-binding bids to purchase 20% of Oncor.[43] GIC's bid noted that while it had "sufficient capacity to acquire the full 20%" it had had "preliminary discussions with a small number of selected major investors in respect of forming a consortium of two with each party acquiring 10%."[44] As for Borealis, Steven Zucchet, who worked on behalf of OMERS Infrastructure on the purchase of Borealis' minority interest in Oncor, testified that while its non-binding bid "solely identified [Borealis]" as the prospective purchaser they "indicated that [Borealis]

---

frowned upon by PUCT, the regulators in Texas, or its public utility, as well as the legislators. And I believe that could have impacted their rates." Trial Tr. 226:12–227:5 (Horton).

[41] Trial Tr. 225:20–226:4 (Horton).

[42] JX 2, at 7; JX 5, at 1. The record also suggests that the ring-fencing, the minority sale, or both were done at the behest of the PUCT. JX 11, at 3. At trial the apparent primary motivation for the sale itself was the requirements of the credit rating agencies. It is unclear from the record the extent to which the ring-fencing was motivated more or less by the PUCT compared to credit rating agency demands.

[43] JX 7; JX 8. In its written proposal, GIC Special Investments noted that it was the "private equity investment arm" of the Government of Singapore Investment Corporation Pte Ltd. JX 8, at 4. It appears from the record that the Government of Singapore Investment Corporation Pte Ltd. is within the same corporate family (or is the same entity) as GIC, which was referred to in the stipulated facts as GIC Private Limited. For clarity, I will refer to all investment entities affiliated with the Government of Singapore—other than Cheyne Walk—as GIC.

[44] JX 8, at 5.

7

would be looking and needing partners to make . . . the final investment."[45] Thereafter, Borealis and GIC sought permission from EFH and its advisors to partner with each other for a bid for the 20% interest—such permission was apparently granted.[46]

On April 14, 2008 Borealis and GIC submitted a joint final binding offer for 20% of the membership interests of Oncor.[47] Borealis and GIC proposed a structure where they would form a Delaware corporation (the "Tax Blocker"),[48] which would in turn form a Delaware limited liability company that would directly hold the Oncor membership interests;[49] Borealis and GIC proposed that they would each directly own 49.5% of the Tax Blocker.[50] The bid noted that Borealis and GIC would "require the participation of a minority third party co-investor."[51] Borealis and GIC sought to sell 1% of the Tax Blocker to a minority third party co-investor such that neither had control of the Tax Blocker, allowing them to take advantage of Section 892 of the Internal Revenue Code.[52] Section 892 of the Internal Revenue Code

---

[45] Trial Tr. 452:15–452:17 (Zucchet). OMERS Infrastructure is the infrastructure investment arm of OMERS. *Id*. at 444:11–444:15 (Zucchet).

[46] JX 13, at 1. Steven Zucchet testified that he "made a very strong appeal to the sponsors and their investment bank that they should allow OMERS and GIC to partner up . . . ." Trial Tr. 456:6–456:12 (Zucchet).

[47] JX 23.

[48] Trial Tr. 367:23–368:2 (Zucchet).

[49] The Tax Blocker was eventually TTHC; the limited liability company was eventually TTI.

[50] JX 23, at 6.

[51] *Id*.

[52] Trial Tr. 455:5–455:12 (Zucchet), 437:3–437:9 (Baldwin), 668:18–669:1 (Evenden). For clarity, I note that this was contemplated to be 1% of 20% of Oncor—a .2% ownership interest.

provides beneficial tax treatment for sovereign investors.[53] The purpose of the proposed transaction structure—namely, the Tax Blocker and the 1% investor—was to allow Borealis and GIC to reduce their tax exposure in connection with the investment.[54]

After the submission of Borealis and GIC's joint final binding offer, EFH expressed interest in moving forward with the transaction.[55] On August 11, 2008, Borealis, Cheyne Walk (GIC's indirect wholly-owned subsidiary), and TTHC (the Tax Blocker) executed a term sheet (the "Term Sheet") that outlined terms with respect to the minority investment in Oncor.[56] The Term Sheet anticipated that TTI, —the limited liability company formed to directly hold the Oncor membership interests—would enter into a Contribution and Subscription agreement with Oncor "in connection with the subscription by [TTI] of limited liability company interests in Oncor."[57] The next day, the Contribution and Subscription Agreement was executed, pursuant to which Oncor agreed to sell 125,412,500 LLC units (amounting to a 19.75% equity stake) to TTI for approximately $1.25 billion.[58] The sale was

---

[53] *Id.* at 668:18–668:21 (Evenden). The section is codified at 26 U.S.C. § 892.
[54] Trial Tr. 369:19–370:11 (Baldwin), 454:17–454:21 (Zucchet).
[55] JX 25, at 1 ("The sponsors will be prepared to move forward at $1.27 bn value level . . .").
[56] JX 34.
[57] *Id.* at 3.
[58] JX 35; PTSO, ¶ 19.

subject to the execution of an investor rights agreement among Oncor, Oncor Holdings, EFH, and TTI.[59]

In line with the proposed structure in the joint final bid—and consistent with the tax strategy of Borealis and GIC—the Term Sheet and the Contribution and Subscription Agreement contemplated a yet-to-be-identified minority investor in TTHC.[60] On September 30, 2008, a representative from Torys LLP—M&A counsel to Borealis and GIC in connection with the Oncor investment—sent Hunter Hunt—the current Co-CEO of Hunt Consolidated—a "teaser" outlining the contemplated minority investment in TTHC.[61] The teaser noted that the minority investor in TTHC would hold at least 1% and not more than 5% of the investment.[62] The next day a Borealis representative emailed Kirk Baker at Hunt a suite of documents pertaining to the proposed investment.[63] On October 10, 2008 Steven Zucchet conveyed to representatives of GIC that they had "a verbal commitment from Kirk [Baker] that Hunt will step in as a 1% co-investor . . . ."[64]

---

[59] JX 35, § 6.3(c); PTSO, ¶ 19.

[60] JX 34, at 8–9; JX 35, § 6.2(d). A condition to the closing of the Contribution and Subscription Agreement was that TTI "shall have received an irrevocable and legally binding equity commitment . . . to acquire between 1% and 5% of the capital stock and shareholder debt of [TTHC] . . . ." JX 35, § 6.2(d).

[61] JX 36; Trial Tr. 154:9–154:10 (Hernandez). Hunter Hunt is also the CEO of Hunt Energy. Trial Tr. 154:9–154:10 (Hernandez).

[62] JX 36, at 6. Anthony Horton testified that he suggested the minority interest in TTHC should be "as high as 5 percent" because he "felt it was going to be very difficult to find a 1 percent owner of a 20 percent stake in a minority ownership." Trial Tr. 250:5–250:14 (Horton).

[63] JX 37.

[64] JX 41, at 1.

10

The transaction to sell a 19.75% minority stake in Oncor to Borealis, Cheyne Walk, and Hunt closed on November 5, 2008.[65] Following closing, the direct ownership of Oncor's LLC units was as follows: Oncor Holdings owned approximately 80%, TTI owned 19.75%, and Oncor Management Investment LLC ("OMI") owned approximately .25%.[66] TTI was a single-asset entity wholly-owned by TTHC.[67] TTHC—itself a single purpose entity created to own equity interests in TTI—had the following ownership structure: Cheyne Walk owned 49.5%, Borealis owned 49.5%, and Hunt owned 1%.[68] TTHC had a five-member board: two board seats for each of Borealis and Cheyne Walk, and one board seat for Hunt.[69]

Three documents, among others, were executed contemporaneously in connection with the minority sale. First, TTHC, Borealis, Cheyne Walk, and Hunt entered into the initial TTHC Shareholders Agreement "to govern the relationship among the parties in their respective capacities as holders of Shares in the capital of [TTHC] and as indirect holders of limited liability company interests in TTI LLC and Oncor."[70] Second, Oncor Holdings, TTI, and OMI entered into the Second

---

[65] PTSO, ¶ 19.
[66] *Id.* ¶ 21. Members of Oncor management owned LLC units of Oncor through OMI. *Id.* While the PTSO states that OMI owned .25% of Oncor's LLC units, Oncor's November 5, 2008 Second Amended and Restated LLC Agreement reflects a .21% ownership. JX 47, at 47. Later documents put OMI's stake at .22%. JX 69, at 2–3.
[67] PTSO, ¶ 20.
[68] *Id.* ¶¶ 20, 24.
[69] JX 46, § 2.1. TTHC retains this board structure. JX 171, § 2.1.
[70] PTSO, ¶ 20; JX 46, at 6.

11

Amended and Restated LLC Agreement of Oncor.[71]  Finally, Oncor, Oncor

Holdings, TTI, and EFH entered into an investor rights agreement (the "Oncor IRA")

to "establish . . . the rights and obligations arising out of, or in connection with, their

ownership of [Oncor] LLC Units."[72]

The Oncor IRA—still in effect—contains restrictions on the ability of TTI to

transfer its Oncor LLC units.  Section 3.1(c) of the Oncor IRA provides that

"Transfers[73] of LLC Units[74] may only be made in strict compliance with all

applicable terms of [the Oncor IRA] and [Oncor's] LLC Agreement."[75]  During a

period commencing on the earlier of November 5, 2015 or a Qualified IPO,[76] private

Transfers—those permitted by applicable securities law but not under a registration

statement or pursuant to Rule 144 of the Securities Act of 1933—cannot be

---

[71] PTSO, ¶ 25.

[72] *Id*. ¶ 22; JX 45, at 4.

[73] "Transfer" is defined as: "any direct or indirect transfer, sale, gift, assignment, exchange, mortgage, pledge, hypothecation, encumbrance or any other disposition (whether voluntary or involuntary, by operation of Law, pursuant to judicial process or otherwise) of any LLC Units (or any interest (pecuniary or otherwise) therein or rights thereto).  In the event that any Member that is a corporation, partnership, limited liability company or other legal entity (other than an individual, trust or estate) ceases to be controlled by the Person controlling such Member or Permitted Transferee thereof, such event shall be determined to constitute a 'Transfer' subject to the restrictions on Transfer contained or referenced herein."  JX 45, at 47.

[74] "LLC Unit" is defined as "an equal, fractional part of all the Interests, and having the rights and obligations specified with respect thereto in [Oncor's LLC] Agreement, and any successor," and "Interest" is defined as "a limited liability company interest in Oncor . . . ."  JX 45, at 44; JX 47, at 41.

[75] JX 45, § 3.1(c).

[76] The parties have stipulated that to date a "Qualified IPO" has not occurred.  PTSO, ¶ 55.

consummated unless the transferor complies with Section 3.9 of the Oncor IRA.[77]

Section 3.9 provides EFH a Right of First Refusal ("ROFR") in the event TTI intends

to Transfer its LLC Units. In that case, Section 3.9 requires TTI or its Permitted

Transferees[78] to provide EFH with written notice of its intent to Transfer (a "Notice

of Intention to Sell")[79] accompanied by an irrevocable written offer (an "Inside

Offer") to sell or otherwise Transfer to EFH all of the LLC Units offered on the same

terms and conditions as set forth in the Notice of Intention to Sell.[80]

*C. Sempra Purchases EFH out of Chapter 11 Bankruptcy; InfraREIT Transaction*

On April 29, 2014, EFH and many of its affiliates filed voluntary petitions for

Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the

District of Delaware.[81] Oncor itself did not file for bankruptcy and multiple

unsuccessful attempts were made to purchase EFH's ownership stake in Oncor under

the jurisdiction of the bankruptcy court.[82] After nearly four years of bankruptcy

proceedings, on March 9, 2018 Sempra purchased EFH for $9.45 billion pursuant to

---

[77] JX 45, §§ 3.1(a)(iv), 3.9(a). Such Transfers also needed to comply with Section 3.4, which is not at issue in this Action. *Id*. § 3.1(a)(iv)

[78] Permitted Transferees are limited to affiliates and successor entities of the Members (TTI and Oncor Holdings). *Id*. at 45.

[79] The "Notice of Intention to Sell" must state "(i) the number of LLC Units . . . to be Transferred . . . (ii) the purchase price therefor, including a description of any non-cash consideration sufficiently detailed to permit valuation thereof, (iii) the identity of the proposed transferee and (iv) any other material terms and conditions of the proposed Transfer, including the proposed Transfer date . . . ." *Id*. § 3.9(b).

[80] *Id*.

[81] PTSO, ¶ 22.

[82] Trial Tr. 144:13–145:1 (Hernandez), 11:19–11:24 (Mihalik), 146:10–146:14 (Hernandez).

a plan of reorganization that was confirmed by the Bankruptcy Court on February 27, 2018.[83]

Before the acquisition by Sempra was completed, the transaction was approved by the PUCT.[84] The PUCT's Order addressed the joint report and application of Oncor and Sempra for PUCT approval of Sempra's proposed acquisition of EFH's approximately 80% indirect interest in Oncor and found that the acquisition was in the public interest provided that all the regulatory commitments described in the Order were met.[85] The Order also noted that Sempra must receive PUCT approval of any transaction in which Sempra seeks to acquire the 19.75% ownership interest in Oncor held by TTI.[86]

Subsequent to the acquisition, EFH was renamed STH and EFIH was renamed STIH.[87] Oncor Holdings also purchased the approximately 0.25% of Oncor's LLC Units owned by OMI with proceeds from a capital contribution to Oncor Holdings from Sempra.[88] On the same day Sempra's purchase of EFH closed, Oncor Holdings

---

[83] PTSO, ¶ 40. TXU and Luminant, the unregulated side of EFH's business, had already been spun off from EFH under new parent company Vistra. JX 68, at 2.
[84] PTSO, ¶ 40.
[85] JX 69, at 1.
[86] *Id*. at 2.
[87] PSTO, ¶ 41.
[88] *Id*.; JX 69, at 2–3.

and TTI entered into the Third Amended and Restated LLC Agreement of Oncor (the "Oncor LLC Agreement").[89]

InfraREIT is an electric transmission and distribution company.[90] On October 18, 2018 Oncor agreed to acquire all of the equity interests of InfraREIT for $1.275 billion.[91] As part of the negotiations in the InfraREIT transaction, Sempra attempted to purchase Hunt's equity interest in TTHC, but that attempt was abandoned prior to closing.[92] In connection with funding TTI's portion of the InfraREIT transaction, Borealis, Cheyne Walk, and Hunt agreed to amend the TTHC Shareholders Agreement (the "TTHC SA").[93] Also in connection with such funding, the parties created TTFinco, resulting in TTI's current ownership structure, with TTHC owning 100% of TTFinco and TTFinco owning 100% of TTI; ownership of TTHC was not affected by the creation of TTFinco.[94]

---

[89] PTSO, ¶ 25; JX 70. While the PTSO states that OMI entered into the Third Amended and Restated LLC Agreement of Oncor, the agreement itself does not reflect that—unlike the Second Amended and Restated LLC Agreement of Oncor, there is no OMI signature block. *Compare* JX 70 *with* JX 47, at 36 (OMI signature block). This would be consistent with the description of the transaction—in both the PTSO and the PUCT Order—as including STH's purchase of OMI's Oncor LLC Units.

[90] PSTO, ¶ 42.

[91] *Id.*

[92] Trial Tr. 768:2–768:7 (Christensen) ("Q: Was Sempra Contemplating a purchase of the 1 percent as part of IntraREIT? A: It was. Q: Did that proceed? A: No, that did not proceed. That came out of the term sheet."); *Id.* at 477:8–478:4 (Zucchet). The Executive Vice Present and CFO of Sempra testified that Sempra had taken steps, including holding discussions with credit rating agencies, to determine whether such an acquisition would affect Oncor's credit rating. *Id.* at 36:12–36:24 (Mihalik).

[93] PSTO, ¶ 42; JX 171. This is the current operative TTHC Shareholders Agreement.

[94] PTSO, ¶ 43.

15

*D. Hunt's Sale Process*

As part of the amendments to the TTHC SA, the parties—Borealis, Cheyne Walk, and Hunt—made changes to Section 6.4, titled "Right of First Offer."[95] The changes modified Hunt's obligations to Borealis and Cheyne Walk in connection with a sale of its ownership interest in TTHC. Hunt's motivation to push for these changes was that it had been interested in buying the majority stake in Oncor during the bankruptcy process, but once Sempra purchased EFH, Hunt "no longer had an interest in maintaining [the 1% ownership stake in TTHC]" because "for Hunt it was always a lot more strategic value to be a minority shareholder when [it was] interested in potentially someday acquiring."[96]

The amendments to the TTHC SA gave Hunt a "Minority Shareholder Special Period"—a period in which Hunt (and only Hunt) could seek to sell its interest in TTHC outside of the process normally required by the TTHC SA.[97] The period

---

[95] Trial Tr. 723:17–723:21 (Evenden); JX 171, § 6.4. Section 6.4.1 reads: "[i]f at any time any Shareholder (each, a 'Selling Shareholder') wishes to sell some or all of the Shares held by the Selling Shareholder, it shall give notice thereof (the 'First Offer Notice'), to the other Shareholders (the 'Other Shareholders' which term, for greater certainty, excludes the Selling Shareholder and its Affiliates). The First Offer Notice shall state that the Selling Shareholder wishes to sell such number of the Shares (the 'Optioned Shares') held by it and shall state the price (which shall be payable in cash and shall be identical on a per share basis) which the Selling Shareholder is willing to accept for such Optioned Shares." JX 171, § 6.4.1 (emphasis omitted).

[96] Trial Tr. 145:23–146:14 (Hernandez), 147:23–148:9 (Hernandez).

[97] JX 171, § 6.4.1. Section 6.4.1.1 reads: "[n]otwithstanding anything to the contrary in this Article 6, during the period (the 'Minority Shareholder Special Period') commencing on the date hereof and ending on the date that is 90 days after the earlier of (a) the consummation of the transactions contemplated by that certain Agreement and Plan of Merger, dated as of October 18, 2018, among Oncor and InfraREIT Inc. and certain other parties specified therein, as the same may be amended from time to time (as amended, the 'InfraREIT Merger Agreement'), and (b) the termination of

16

began on October 30, 2018 (the day the TTHC SA was executed) and was prescribed to end 90 days after the earlier of (i) the closing of the InfraREIT transaction or (ii) the termination of the InfraREIT merger agreement in accordance with its terms.[98] In the Minority Shareholder Special Period, Hunt could market its Shares[99] in TTHC

---

the InfraREIT Merger Agreement in accordance with its terms, [Hunt] shall be free to conduct a marketing process with respect to the Shares held by it and to make non-binding offers to sell (or solicit non-binding offers to purchase) such Shares to (or from) one or more Third Parties (as defined below) on such terms as [Hunt] shall determine in its sole discretion, in each case without delivering a First Offer Notice to the Other Shareholders; provided, that (i) [Hunt] shall not offer to sell the Shares held by it to (or solicit or accept offers to purchase such Shares from) Elliott Management Corporation or Bluescape Energy Partners, or any pass-through or structured finance vehicles that serve primarily as investment vehicles for such entities (any such entity or vehicle, an 'Excluded Third Party') and (ii) if as a result of the marketing process described above, [Hunt] receives a bona fide written offer from a Third Party (other than an Excluded Third Party) to purchase the Shares held by it that it has determined it would like to accept, it shall deliver a First Offer Notice, together with a copy of the bona fide written offer (which offer shall include the name and address of the proposed transferee), to the Other Shareholders prior to accepting such offer." *Id*. § 6.4.1.1 (emphasis omitted). Section 6.4.1.2 reads: "[i]f [Hunt] notifies the Other Shareholders at any time during the Minority Shareholder Special Period that it intends to conduct a marketing process as contemplated by Section 6.4.1.1, upon [Hunt's] request, [TTHC] shall, and shall cause [TTFinco] and [TTI] to, reasonably cooperate and assist the Minority Shareholder with any due diligence process undertaken by any Third Party (other than an Excluded Third Party) in connection with such marketing process, including by (i) providing reasonable access at reasonable times upon reasonable advance notice to the books, records and other documents of [TTHC], [TTFinco] and [TTI] and (ii) providing reasonable access at reasonable times upon reasonable advance notice to the directors and officers of [TTHC], [TTFinco] and [TTI] so any such Third Parties may ask questions of such persons; provided, however, that, in the case of both clauses (i) and (ii), (x) such access would not violate applicable law or contract or jeopardize the protection of the attorney client or other applicable privilege and (y) any such Third Party has executed a confidentiality agreement in form reasonably acceptable to [TTHC's] Board. For the avoidance of doubt, any such marketing process (including any such due diligence process) shall be at [Hunt's] sole cost and expense (other than any general and administrative or 'overhead' expenses that are normal and incidental to [TTHC] providing the access to books, records, documents, directors and officers contemplated above)." *Id*. § 6.4.1.2.

[98] *Id*. § 6.4.1.1.

[99] "Shares" means "shares of capital stock of [TTHC] now or from time to time issued and outstanding and includes the Class A Shares, the Class B Shares, any Shares into which Shares may be converted or changed or which result from a consolidation, subdivision, reclassification or redesignation of Shares, any Shares which are received as a stock dividend or distribution payable

17

without first delivering a "First Offer Notice" to Borealis and Cheyne Walk.[100]

Outside of the Minority Shareholder Special Period, the TTHC SA gave the Other

Shareholders (those not attempting to sell their Shares) a Right of First Offer

("ROFO") which required a "Selling Shareholder"—"any Shareholder [who] . . .

wishes to sell some or all of the Shares"—to deliver a First Offer Notice to the Other

Shareholders before marketing its Shares.[101]  The First Offer Notice must state that

the Selling Shareholder wishes to sell a quantity of Shares (the "Optioned Shares")

held by it and the price (which shall be payable in cash and shall be identical on a

per share basis) that the Selling Shareholder is willing to accept for such Optioned

Shares.[102]  While Hunt is not required deliver a First Offer Notice before marketing

its Shares in the Minority Shareholder Special Period, if Hunt receives a bona fide

written offer pursuant to the Minority Shareholder Special Period, it then must

deliver a First Offer Notice to Borealis and Cheyne Walk.[103]  Under the TTHC SA,

within 20 business days after receiving a First Offer Notice the Other Shareholders

have the option to purchase their pro rata amount of the Optioned Shares for the

---

in Shares and any Shares which may be received by the parties. hereto or bound hereby as a result of a merger, arrangement or other reorganization of or including [TTHC]." *Id*. at 12.
[100] *Id*. §§ 6.4.1.1, 6.4.1.2.
[101] *Id*. § 6.4.1.
[102] *Id*.
[103] *Id*. § 6.4.1.1.  Hunt is also required to deliver the bona fide written offer to Borealis and Cheyne Walk.  *Id*.

18

price set out in the First Offer Notice.[104]  If such option is not exercised within 20 business days, the Other Shareholders are deemed to have rejected the offer to purchase such Optioned Shares.[105]  Additionally, in certain circumstances during the Minority Shareholder Special Period—such as if the Other Shareholders agree that Hunt may sell to the prospective transferee or the Other Shareholders do not agree to purchase the Optioned Shares within 25 business days of receipt of a First Offer Notice—certain "Tag-Along Rights" do not apply.[106]  In other words, during the Minority Shareholder Special Period Hunt is permitted to market its Shares free of Borealis' and Cheyne Walk's right to insist on being bought out pursuant to the Tag-Along Rights as well.  In negotiating the terms of the Minority Shareholder Special Period, Borealis and Cheyne Walk attempted to insert Sempra as an Excluded Third Party—one who could not purchase Hunt's Shares pursuant to the Minority Shareholder Special Period—but Hunt rejected this proposal as a "nonstarter."[107]

---

[104] *Id*. § 6.4.3.1.  Each of Borealis and Cheyne Walk also have the option to purchase each other's pro rata amount should the other party decline to exercise its right to purchase pursuant to the First Offer Notice.  *Id*. § 6.4.4.

[105] *Id*. § 6.4.3.  If the Other Shareholders agree to purchase the Optioned Shares, a sale is to be completed by the 20th business day after the Other Shareholders give notice of their election to purchase the Optioned Shares, however, if the sale is not completed within 60 business days after the Other Shareholders give notice of their election to purchase the Optioned Shares, then such event is a "Stalled Sale" and the Other Shareholders are deemed to have rejected the offer made to them to purchase the Optioned Shares.  *Id*. § 6.4.6.

[106] *Id*. § 6.4.7.  The "Tag-Along Rights" can be found in Section 6.5 of the TTHC SA.

[107] JX 158, at 4 ("We attempted to include Sempra as an unacceptable purchaser because as part of the s. 892 structuring the 1% owned by the Hunts has heightened governance rights which we may not want Sempra to have in TTHC (for example it comes with a board seat), but the Hunts refused to accept the Sempra carve out."); Trial Tr. 724:15–724:24 (Evenden), 779:11–779:16

Anticipating that the PUCT would approve the InfraREIT transaction in April 2019, Hunt planned for a mid-May closing of the transaction.[108] The Minority Shareholder Special Period would terminate 90 days thereafter in accordance with the TTHC SA.[109] In April 2019, Hunt reached out to Sempra to "reengage with them and see if they would be willing or see if they were interested in committing to a sale [of Hunt's 1% interest in TTHC] during that period."[110] On April 11, 2019, Nathan Christensen, Senior Vice President and General Counsel of Hunt Consolidated, emailed Trevor Mihalik, Executive Vice President and Chief Financial Officer of Sempra, a "summary of the ROFO provisions of the [TTHC SA]" in advance of a scheduled call that afternoon.[111] On May 28, 2019 Hunt's counsel, Baker Botts L.L.P. ("Baker Botts"), emailed Sempra's counsel, White & Case LLP ("White & Case"), to inquire if White & Case had conferred with Sempra regarding the acquisition.[112] A call appears to have occurred between the parties on May 30, 2019.[113]

---

(Christensen) ("I was communicating that introducing this exclusion on Sempra was a total nonstarter . . . .").

[108] Trial Tr. 787:19–788:7 (Christensen). The transaction ultimately closed on May 15, 2019. *Id.* at 785:5–785:7 (Christensen).

[109] JX 171, § 6.4.1.1.

[110] *Id.* at 788:11–788:14 (Christensen).

[111] JX 199; Trial Tr. 756:13–756:17 (Christensen), 11:3–11:9 (Mihalik).

[112] JX 201, at 6–7.

[113] *Id.* at 3.

On June 13, 2019, Sempra delivered to Hunt a non-binding proposal for the purchase of Hunt's 1% stake in TTHC (the "Hunt Shares") for approximately $23.32 million along with a due diligence request list related to the proposal.[114] The proposal outlined Sempra's interpretation of the interaction between Sempra's ROFR in the Oncor IRA and the ROFO in the TTHC SA. Sempra stated its "understanding that Section 6.4 of [the TTHC SA] . . . contains a right of first offer in favor of the other shareholders of TTHC in connection with proposed transfers of shares in TTHC."[115] However, Sempra continued that it "also understand[s] that Section 6.3 of the [TTHC SA] provides that, notwithstanding anything to the contrary in the [TTHC SA], no transfer of shares in TTHC may be consummated if such transfer would result, directly or indirectly in a breach of [the Oncor IRA]."[116] Sempra concluded that "the [TTHC SA] and Oncor IRA, when read together, results in an agreement whereby any transfer of shares in TTHC that is not made in compliance with Sempra's right of first refusal contained in Section 3.9 of the Oncor

---

[114] PTSO, ¶ 49; JX 202. The parties have also stipulated that the proposal included the purchase of "certain notes." PTSO, ¶ 49.

[115] JX 202, at 4.

[116] *Id*. Section 6.3 of the TTHC SA reads: "[n]otwithstanding anything to the contrary in this Agreement, a Shareholder shall not be permitted to Transfer any Shares, and neither [TTHC] nor any other Shareholder will recognize any such purported Transfer or any purported Shareholder related thereto, if such Transfer would result, directly or indirectly, in a breach of . . . the [Oncor IRA] . . . ." JX 171, § 6.3.

21

IRA constitutes a breach of the Oncor IRA by TTI."[117]  Such a transaction, in Sempra's view, would be a nullity.

The next day, Hunt sent Sempra's non-binding proposal to Borealis and Cheyne Walk.[118]  Hunt enclosed Sempra's legal due diligence request list and requested that "[c]onsistent with [their] obligations under the [TTHC SA]"[119] Borealis and Cheyne Walk "provide [their] cooperation and assistance in connection with the limited confirmatory due diligence investigation that Sempra is planning to carry out."[120]  On June 18, 2019, Borealis responded to Hunt via email.[121]  Borealis noted that it did "not believe [Hunt's] June 14th letter constitutes a First Offer Notice under the [TTHC SA]" and that "TTHC does not agree with Sempra's inference in its June 12th letter to you that [Hunt] may not transfer its TTHC interest to the current TTHC shareholders pursuant to the ROFO provisions of the [TTHC SA] without first complying with the ROFR provisions of the Oncor IRA."[122]  Borealis noted that

---

[117] JX 202, at 4.

[118] JX 204.  It is, at some points, unclear from the record whether an individual is representing Borealis or OMERS, or Cheyne Walk or GIC.  The two witnesses at trial who purported to represent Borealis and Cheyne Walk, Steven Zucchet and Rhys Evenden respectively, appear from the record to be, respectively, employees of OMERS and GIC yet act on behalf of the two majority shareholders in TTHC.  Therefore, for clarity, I will refer to any communications to or from a Borealis or OMERS representative as a communication to or from Borealis and will refer to any communications to or from a Cheyne Walk or GIC representative as a communication to or from Cheyne Walk.

[119] It appears that Hunt was referring specifically to the requirements of Section 6.4.1.2 of the TTHC SA.  Trial Tr. 785:16–786:18 (Christensen).

[120] JX 204, at 7–8.

[121] JX 205.

[122] *Id*. at 1.

it would "honor its cooperation and assistance obligations under the [TTHC SA]" but that it expected Hunt to provide to Sempra any due diligence information that was in Hunt's possession.[123]

After a series of emails between Hunt and Borealis discussing a Sempra non-disclosure agreement for the proposed transaction and due diligence materials, Borealis emailed Hunt on July 1, 2019 that it would "be following up with a formal response shortly, but wanted to advise you in advance that we are not going to consent to the sale of Hunt's 1% interest in TTHC to Sempra."[124] Borealis' formal letter, dated July 2, 2019, conveyed its view that the proposed sale to Sempra was not a "Permitted Transfer" under the TTHC SA.[125] Borealis continued that any "Transfer" under the TTHC SA that was not a "Permitted Transfer" required the consent of both Borealis and Cheyne Walk, and Borealis would not consent to the transaction.[126] Therefore Borealis did "not believe [it was] necessary or reasonable to enter into a confidentiality agreement or provide the documents requested by Hunt as part of Sempra's due diligence."[127]

Hunt responded by letter on July 8, 2019.[128] Hunt stated that the TTHC SA imposed no bar on Hunt's sale of the Hunt Shares to Sempra because the consent

---

[123] Id.
[124] JX 210, at 4.
[125] JX 213, at 6.
[126] Id.
[127] Id.
[128] JX 220.

23

right did not apply to "Transfers of Shares 'expressly permitted by, and in accordance with, Article 6' of the [TTHC SA]."[129] Hunt stated that it "plan[ed] to comply with the right of first offer provisions contained in Section 6.4 [of the TTHC SA] prior to effecting a Transfer of its Shares to Sempra."[130] Thus, Hunt concluded that "a Transfer of Shares to Sempra in compliance with Section 6.4 is permitted by Article 6 and does not require [Borealis' or Cheyne Walk's] consent."[131] Hunt cautioned that if Borealis and Cheyne Walk did not cooperate with the due diligence process Hunt could "only conclude that [they] are not acting in good faith and are in clear breach of the terms of the [TTHC SA]."[132]

On July 11, 2019 Hunt and STIH executed a Share Purchase Agreement (the "SPA") whereby Hunt agreed, among other things, to sell to STIH (and STIH agreed to buy) the entirety of the Hunt Shares subject to the satisfaction of certain conditions precedent including that either (1) Borealis and/or Cheyne Walk's ROFO shall have (i) expired without being exercised or (ii) been waived, or (2) STIH shall have received a judicial determination that it is entitled to purchase the Hunt Shares notwithstanding any purported exercise by Borealis or Cheyne Walk of their ROFO.[133]

---

[129] *Id.* at 6.
[130] *Id.* at 7.
[131] *Id.*
[132] *Id.*
[133] PTSO, ¶ 50; JX 228. STIH also agreed to purchase certain notes held by Hunt. PTSO, ¶ 50. A week later, a Sempra presentation noted that they "are moving forward to complete the

24

Hunt sent the executed SPA to Borealis and Cheyne Walk as an exhibit to a July 11, 2019 letter purporting to be a "First Offer Notice delivered by the Hunt Shareholder pursuant to Section 6.4.1 of the [TTHC SA]."[134] The letter enumerated the equity interests (and notes) Hunt wished to sell, the price it was willing to accept, and other terms. The letter "confirm[ed] that [Hunt] ha[d] received a bona fide written offer from a Third Party (who is not an Excluded Third Party)" and asked Borealis and Cheyne Walk to "provide notice within twenty (20) Business Days from receipt of this letter as to whether you will (i) purchase your pro rata portion of [the Hunt Shares] (and, if you wish to purchase more than your pro rata portion, indicate how many additional [Shares] you wish to purchase) or (ii) agree that [Hunt] may sell [the Hunt Shares] to a Third Party."[135]

On July 22, 2019, Borealis sent a letter to Hunt stating that, pursuant to Section 6.4.3.1 of the TTHC SA, it was exercising its ROFO and would purchase its pro rata portion of the Hunt Shares, as well as any of the Hunt Shares that Cheyne Walk declined to purchase, for the price and on the payment terms set out in Hunt's July 11, 2019 letter.[136] Borealis noted that because "it had exercised [its] right to

---

acquisition of Hunt's 1% interest in TTI as it contains certain ownership/ROFO rights and has tactical value to Sempra, however, given the tactical importance of Hunt's stake, GIC and OMERS have been unwilling to support Hunt in certain aspects of this divestiture." JX 230, at 11.

[134] JX 225, at 4.

[135] *Id*.

[136] PTSO, ¶ 52; JX 231. A December 11, 2018 OMERS internal presentation noted that "OMERS is now able to rely on s.897(I) of the US Tax code ("s.897") and is no longer constrained to own less than 50% of a US blocker to qualify for the capital gains tax exemption under s.892." JX 189,

elect to purchase [the Hunt Shares] under Section 6.4 [of the TTHC SA], any attempt to Transfer those Shares to [STIH]—or any other third party—would constitute a breach of Section 6.4."[137]  Borealis reiterated that it would not provide its consent for Hunt to transfer the Hunt Shares to STIH.[138]  Borealis alleged that Hunt had breached the TTHC SA by executing the SPA "*prior* to providing Borealis the First Offer Notice and *prior* to allowing the Other Shareholders to exercise their contractual right to acquire Hunt's Shares before a binding offer to sell or purchase had been made."[139]  Borealis contended that Hunt was "contractually obligated to deliver a First Offer Notice, together with a copy of the bona fide written offer prior to accepting such offer . . . ."[140]  Borealis also alleged other breaches of the TTHC SA by Hunt, including Hunt's agreement in the SPA to provide confidential communications between TTHC shareholders to Sempra.[141]

On July 24, 2019, STH sent a letter to Borealis, Cheyne Walk, TTI, TTHC, and TTFinco purporting to exercise its ROFR pursuant to Section 3.9(a) of the Oncor IRA and designating STIH to purchase the Hunt Shares.[142]  The letter stated that "[p]ursuant to Section 3.9 of the [Oncor IRA], the Hunt Shares constitute Offered

---

at 2.  Referring to Hunt's July 11 letter, Cheyne Walk noted in a July 11, 2019 internal email that "[d]ue to the structure, we are not able to buy 'our half'" of the offered shares.  JX 227, at 1.
[137] JX 231, at 4.
[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *Id.* at 5.
[142] PTSO, ¶ 53; JX 236.

Units for purposes of the [Oncor IRA], and the ROFO Transfer [to Borealis] is subject to STH's (or STH's designee's) right of first refusal as set forth in the [Oncor] IRA."[143]  STH asserted that the letter "constitute[d] STH's notice of exercise of the right of first refusal" and noted that it "expect[ed] TTI to comply with its obligations under the [Oncor IRA]."[144]  STH also "expect[ed] TTI . . . to cause TTHC and the applicable TTHC Shareholders (i) to cooperate in the consummation of the ROFR Purchase [by STIH], and (ii) not to attempt or purport to Transfer the Hunt Shares to the applicable TTHC Shareholders in connection with the ROFO Transfer [to Borealis], or to any other person or entity other than STIH."[145]

*E. Procedural History*

On July 29, 2019, Borealis filed a Verified Complaint asserting a claim against Hunt for breach of the TTHC SA.  Borealis also filed a motion seeking a temporary restraining order ("TRO") enjoining Hunt from transferring the Hunt Shares to STIH pending resolution of the dispute between Borealis and Hunt.  On August 2, 2019, STH and STIH filed a Motion to Intervene.  On August 6, 2019, I heard Oral Argument on Borealis' TRO Motion and STH and STIH's Motion to Intervene.  At the hearing, I granted STH and STIH's Motion to Intervene.  On August 7, 2019, STH and STIH filed a Verified Complaint in Intervention against Borealis, TTI, and

---

[143] JX 236, at 4.
[144] *Id.*
[145] *Id.*

27

Hunt asserting claims for declaratory judgments against Borealis and Hunt, and a claim against TTI for breach of contract (the "Sempra Complaint"). On August 12, 2019, Cheyne Walk filed an Unopposed Motion to Intervene, which I granted on August 13, 2019; Cheyne Walk filed its Verified Complaint in Intervention asserting claims for declaratory judgments against Hunt, STH, and STIH on August 14, 2019.

Upon entering a status quo order (the "SQO") resolving Borealis' TRO Motion on August 13, 2019, I set the Sempra Complaint for an expedited trial on the merits.[146] The SQO prevented STIH and Hunt from consummating the sale during the period ending on the earlier of (i) the Court issuing a Judgment,[147] (ii) December 31, 2019 (since extended to January 30, 2020),[148] (iii) the dismissal of this Action, or (iv) further order of this Court.[149] The SQO also equitably tolled the running of the Minority Shareholder Special Period until ten business days after I issue a Judgment.[150]

The Sempra Complaint pleads four claims.

The first claim, for declaratory relief against Borealis, seeks a declaration that "Borealis' attempt to purchase [the Hunt Shares] pursuant to its [ROFO] triggered

---

[146] Order Regarding Pl.'s Mot. for a Temporary Restraining Order, D.I. 73, ¶ 1.
[147] "Judgment" means "a final judgment determining whether STIH and Hunt are entitled to consummate the Sale, notwithstanding the purported exercise by Borealis or any other person of the right to purchase the Hunt Shares pursuant to Section 6.4 of the [TTHC SA]." *Id.* ¶ 3.
[148] Order Amending August 13, 2019 TRO Order, D.I. 287, ¶ 2.
[149] Order Regarding Pl.'s Mot. for a Temporary Restraining Order, D.I. 73, ¶ 3.
[150] *Id.* ¶ 7.

28

STH's [ROFR] under Section 3.9 of the [Oncor IRA] and STIH (as the designee of STH) is entitled, notwithstanding Borealis' purported exercise of its [ROFO], to consummate the transactions contemplated by the [SPA]."[151]

The second claim, for a declaratory judgment against Borealis, seeks a declaration that "(1) Borealis' attempt to purchase the [Hunt Shares] pursuant to its [ROFO] triggers STH's [ROFR] set forth in Section 3.9 of the [Oncor IRA]; (2) the failure to permit STIH (as STH's designee) to purchase the [Hunt Shares] pursuant to STH's [ROFR] constitutes a material breach of the [Oncor IRA]; and (3) as a result of that breach and pursuant to Section 3.1(c) of the [Oncor IRA], any attempt by Borealis to purchase [the Hunt Shares] pursuant to its [ROFO] is null and void and of no force and effect, and Oncor shall not recognize or be bound by any such purported Transfer and shall not effect any such purported Transfer."[152]

The third claim, for a declaratory judgment against Hunt, seeks a declaration that "any attempt by Hunt to sell the [Hunt Shares] to Borealis pursuant to its [ROFO] is null and void and of no force and effect, and Oncor and TTI shall not recognize or be bound by any such purported Transfer pursuant to Section 3.1(c) of the [Oncor IRA]."[153]

---

[151] Intervenors Sempra Texas Holdings Corp. and Sempra Texas Intermediate Holding Company LLC's Verified Compl. in Intervention, D.I. 54 ("Sempra Compl."), ¶ 40.
[152] *Id*. ¶ 45.
[153] *Id*. ¶ 50.

29

The fourth claim, for breach of contract against TTI, alleges that TTI breached the Oncor IRA by, among other things, "taking no action to recognize or effectuate STH's [ROFR] or to oppose the Borealis Suit."[154]

This matter was tried on an expedited basis, to allow a decision during the period provided in the SQO. My analysis follows.

## II. ANALYSIS

Below, I find that the course of events preceding this litigation gave both Borealis[155] and STH separate contractual rights to purchase the Hunt Shares.

Borealis' right originates in a stockholders' agreement, the TTHC SA. During the Minority Shareholder Special Period, the parties to that agreement—including Hunt—agreed to grant Borealis a right to purchase upon the receipt by Hunt of a bona fide written offer for Hunt's interest in TTHC. Hunt's agreement to sell its shares to STIH invoked Borealis' right to purchase, which became exercisable when Hunt delivered a contractually-defined "First Offer Notice" to Borealis and Cheyne Walk on July 11, 2019.

STH's right to purchase the Hunt Shares originates in a separate contract, the Oncor investor rights agreement—the Oncor IRA. The Oncor IRA gives STH a right of first refusal where TTI intends to sell its interest in Oncor. Here, of course,

---

[154] *Id.* ¶ 56.
[155] I note that because Cheyne Walk did not exercise its right to purchase the Hunt Shares, for simplicity my analysis focuses only on Borealis but applies to Cheyne Walk where applicable.

the transaction contemplated is a sale of Shares in TTHC—a holding company that indirectly represents an ownership interest in Oncor—and not a sale of Oncor LLC Units themselves. Nonetheless, under the Oncor IRA, a sale of TTHC Shares to Borealis is a "Transfer" of Oncor LLC Units triggering STH's right of first refusal, because the definition of "Transfer" in the Oncor IRA is broad enough to encompass the sale of shares of TTHC—an entity that serves solely as an indirect holding company for Oncor. Therefore, STH's right to purchase the Hunt Shares arose by Hunt's offer to sell its shares to Borealis, because the resulting transfer of TTHC Shares to Borealis would constitute a contractual "Transfer of Oncor LLC Units" under the explicit terms of the Oncor IRA. In other words, under the TTHC SA, Hunt's attempt to sell its shares to STIH triggered Borealis' right to purchase— Hunt's offer to Borealis pursuant to that right triggered STH's own right to purchase under the Oncor IRA.

While both Borealis and STH have separate rights to purchase the Hunt Shares, such rights are mutually exclusive: the Hunt Shares are finite and only one entity can purchase them in their entirety. I find that STH's right is superior to that of Borealis because the TTHC SA explicitly prohibits a sale of TTHC Shares that violate the Oncor IRA. In other words, under these facts, Hunt is contractually bound via the TTHC SA to sell to Borealis, if and only if such sale does not breach the Oncor IRA. A sale of the Hunt Shares to Borealis instead of STH, however,

31

would breach the IRA, by contravening STH's contractual right to purchase the shares. Thus, STH is the proper transferee of the Hunt Shares. I explain my rationale in more detail below.

\*\*\*

Resolution of the Sempra Complaint requires a determination of the relative supremacy of STH's ROFR compared to Borealis' ROFO.[156] STH's ROFR is granted in the Oncor IRA, a New York law-governed agreement.[157] Borealis' ROFO arises from the TTHC SA, a Delaware law-governed agreement.[158] The differing choice of law in these agreements need not complicate my analysis, however, because "New York and Delaware law are generally harmonious in their approach to contract interpretation, and each state emphasizes the interpretive primacy of giving effect to the parties' intention as expressed by the written words of their agreements."[159] Both New York and Delaware law will give effect to the ordinary

---

[156] While the mechanics of Hunt's obligations during the Minority Shareholder Special Period essentially have the effect of converting Borealis and Cheyne Walk's right of first offer into a right that resembles a right of first refusal, the parties in this litigation have referred to Borealis and Cheyne Walk's right as a ROFO, and such usage has the benefit of distinguishing the right from STH's right of first refusal (ROFR). Therefore, I refer to Borealis and Cheyne Walk's right to purchase the Hunt Shares as a ROFO, even though the right is not a right of first offer as such.

[157] JX 45, § 5.6(a) ("This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without giving effect to any otherwise governing principles of conflicts of law.").

[158] JX 171, § 1.9 ("This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware (without giving effect to any conflicts or choice of law provisions thereof that would cause the application of the domestic substantive law of any other jurisdiction).").

[159] *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *8 (Del. Ch. July 21, 2000) (internal citations omitted).

meaning of contractual terms if such terms are clear and unambiguous.[160] A contract is ambiguous under New York law where "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings"[161]—Delaware law has the same approach.[162] The laws of both states are in accord that parol evidence may not be used to interpret an unambiguous contract.[163]

1. The TTHC SA Gives Borealis a Conditional Right to Purchase the Hunt Shares

Under the TTHC SA, Hunt's receipt of a bona fide written offer from a non-Excluded Third Party during the Minority Shareholder Special Period triggers Hunt's requirement to deliver a First Offer Notice to Borealis and Cheyne Walk.[164]

---

[160] *In re IBP S'Holders Litig.*, 789 A.2d 14, 54–55 (Del. Ch. 2001) (Explaining that under New York law, "[i]f a contract's meaning is plain and unambiguous, it will be given effect."); *Brainard v. New York Cent. R.R. Co.*, 151 N.E. 152, 154 (N.Y. 1926) ("If the court finds as matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the decision of the case. Plain and unambiguous words, undisputed facts, leave no question of construction except for the court. The conduct of the parties may fix a meaning to words of doubtful import. It may not change the terms of a contract."); *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (Under Delaware law, "[t]he Court will interpret clear and unambiguous terms according to their ordinary meaning.").

[161] *Goldman Sachs Grp., Inc. v. Almah LLC*, 924 N.Y.S.2d 87, 90 (N.Y. App. Div. 2011).

[162] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity.").

[163] *IBP*, 789 A.2d at 55 (Under New York law, "[p]arol evidence may not be used to create a contractual ambiguity; rather, such ambiguity must be discerned by the court from its consideration of the contract as an entire text."); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017) (Under Delaware law, "[i]f a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity.").

[164] JX 171, § 6.4.1.1.

I find that the SPA— a binding agreement to purchase the Hunt Shares for a specified price upon the occurrence of certain closing conditions—between STIH (a non-Excluded Third Party) and Hunt is a bona fide written offer under the TTHC SA sufficient to require Hunt deliver a First Offer Notice to Borealis and Cheyne Walk. Hunt contends it delivered such First Offer Notice on July 11, 2019. A First Offer Notice must state (1) that the Selling Shareholder wishes to sell the Optioned Shares and (2) the price (which shall be payable in cash and identical on a per share basis) which the Selling Shareholder is willing to accept for such Optioned Shares.[165] The notice delivered by Hunt to Borealis and Cheyne Walk on July 11, 2019 fulfils these requirements and therefore I find that that notice, JX 225 in the trial record, is a First Offer Notice as defined in Section 6.4.1 of the TTHC SA.

The TTHC SA prescribes that after receipt of a First Offer Notice the recipient has the right to purchase its pro rata portion of the Optioned Shares—here, the Hunt Shares.[166] The First Offer Notice delivered by Hunt references Borealis' and Cheyne Walk's ability to exercise such right.[167] Borealis validly exercised that right in its

---

[165] *Id*. § 6.4.
[166] *Id*. § 6.4.3 ("Each of the Other Shareholders shall have the right, exercisable by notice given to the Selling Shareholder within 20 Business Days after receipt of the First Offer Notice . . . to agree that it will purchase its pro rata share (based on the number of Shares of the same class (or which are convertible into the same class) as the Optioned Shares which are owned by it compared to the number of Shares of the same such class which are owned by all of the Other Shareholders) of the Optioned Shares for the price and on the terms of payment set out in the First Offer Notice . . . .").
[167] JX 225, at 4 ("As required pursuant to Section 6.4.3 of the [TTHC SA], please provide notice within twenty (20) Business Days from receipt of this letter as to whether you will (i) purchase your pro rata portion of such Subject Shares (and, if you wish to purchase more than your pro rata

34

notice to Hunt dated July 22, 2019—JX 231 in the trial record—agreeing to purchase all of its pro rata portion of the Optioned Shares and any additional remaining Optioned Shares.[168] That right is conditional however, because the TTHC SA contains an "Overriding Prohibition on Transfer" in certain circumstances: "[n]otwithstanding anything to the contrary in this Agreement, a Shareholder shall not be permitted to Transfer[169] any Shares, and neither [TTHC] nor any other Shareholder will recognize any such purported Transfer or any purported Shareholder related thereto, if such Transfer would result, directly or indirectly, in a breach of . . . the [Oncor IRA] . . . ."[170] Thus, Transfers of TTHC Shares are not permitted where such Transfer—here, the sale of the Hunt Shares to Borealis— "would result, directly or indirectly" in a breach of the Oncor IRA.

---

portion, indicate how many additional Subject Shares you wish to purchase) or (ii) agree that the Hunt Shareholder may sell the Subject Shares to a Third Party.").

[168] The remaining Optioned Shares would be Cheyne Walk's pro rata portion.

[169] "Transfer" is defined in the TTHC SA as "any direct or indirect sale, transfer, exchange, assignment, gift, bequest, disposition, mortgage, lien, charge, pledge, encumbrance, grant of security interest or any arrangement by which direct or indirect possession, legal title or beneficial ownership passes from one Person to another, or to the same Person in a different capacity, whether or not voluntary, whether or not by operation of law and whether or not for value, and any agreement to effect any of the foregoing and 'Transferred', 'Transferring' and similar variations have corresponding meanings." JX 171, at 12.

[170] Id. § 6.3. This section also applies to breaches of the Oncor LLC Agreement and a Registration Rights Agreements—no party has alleged a breach of either agreement.

## 2. STH has a Right to Purchase the Hunt Shares under the Oncor IRA, and a Sale to Borealis would Breach the IRA

STH's ROFR right arises from the Oncor IRA. When TTI "intends to Transfer[171] LLC Units"[172] in a private Transfer,[173] it must deliver to STH a written notice of its intention to Transfer such LLC Units accompanied by "a written offer . . . irrevocable for ten (10) Business Days from its receipt to sell or otherwise Transfer to [STH] or its designee . . . all, but not less than all, of the Offered Units."[174] Such an offer is defined as an "Inside Offer."[175] Thus, the Oncor IRA gives STH a right (pursuant to an Inside Offer) to purchase Oncor LLC Units in the event TTI intends to Transfer such LLC Units.[176]

At first glance, conflict between the TTHC SA ROFO and the Oncor IRA ROFR is not apparent. One—the TTHC SA ROFO—gives Borealis and Cheyne Walk a right to purchase *TTHC Shares* in the event Hunt receives a bona fide written

---

[171] "Transfer" as used in the Oncor IRA has a different definition than "Transfer" as used in the TTHC SA.

[172] LLC Unit "means an equal fractional part of all the Interests, and having the rights and obligations specified with respect thereto in [the Oncor LLC Agreement], and any successor entity"; Interest "means a limited liability company interest in [Oncor], including the right of the holder thereof to any and all benefits to which a holder thereof may be entitled as provided in [the Oncor LLC Agreement] together with the obligations of a holder thereof with all of the terms and provisions of [the Oncor LLC Agreement]." JX 45, at 44; JX 47, at 41.

[173] Private Transfers are those under Section 3.1(a)(iv)(B)(2) of the Oncor IRA—no party to this Action has argued that either purported sale here (to Borealis or STIH) does not fall under such Section.

[174] JX 45, § 3.9(b). The "Offered Units" are the "number of LLC Units . . . to be Transferred . . . ." *Id*.

[175] *Id*.

[176] *Id*.

offer for such Shares during the Minority Shareholder Special Period. The other—

the Oncor IRA ROFR—requires TTI to deliver an Inside Offer granting STH a right

to purchase *Oncor LLC Units* in the event TTI intends to Transfer such LLC Units.

However, STH and STIH have submitted that a sale of the Hunt Shares is in fact a

"Transfer" of Oncor LLC Units by TTI under the Oncor IRA, triggering Sempra's

ROFR right.

> The definition of "Transfer" in the Oncor IRA reads:

> any direct or indirect transfer, sale, gift, assignment, exchange, mortgage, pledge, hypothecation, encumbrance or any other disposition (whether voluntary or involuntary, by operation of Law, pursuant to judicial process or otherwise) of any LLC Units (or any interest (pecuniary or otherwise) therein or rights thereto). In the event that any Member that is a corporation, partnership, limited liability company or other legal entity (other than an individual, trust or estate) ceases to be controlled by the Person controlling such Member or a Permitted Transferee thereof, such event shall be determined to constitute a "Transfer" subject to the restrictions on Transfer contained or referenced herein.[177]

For STH and STIH to prevail, this definition must encompass the sale of shares of

the entity (TTHC) two levels upstairs from TTI and three levels removed from Oncor

itself. I find that it unambiguously does so.

Transfer, as defined in the Oncor IRA, is remarkably broad. That a sale of

TTHC Shares is not a direct sale of Oncor LLC Units is of no consequence because

the definition explicitly covers "indirect" sales. Black's Law Dictionary supplies

---

[177] *Id*. at 47.

the definition of "indirect," in pertinent part, as "[n]ot direct in relation or connection; not having an immediate bearing or application."[178] "Transfer" covers not only indirect sales of LLC Units themselves, but any "interest therein" or "rights thereto." A Transfer may also be "involuntary" which is defined in the same dictionary in pertinent part as "without will or power of choice."[179] Thus, a Transfer may occur without the will of TTI or without any choice by it.

I find that the sale of the Hunt Shares constitutes an indirect sale, and, therefore, a Transfer of Oncor LLC Units under the Oncor IRA. Such a sale is one "not direct in relation or connection" to Oncor LLC Units themselves but still constitutes a sale of such LLC Units because the sale is one of a nearly identical interest. TTI owns only Oncor LLC Units; TTFinco owns only TTI units; and TTHC owns only TTFinco unit. To hold TTHC Shares is to indirectly hold Oncor LLC Units. This was true at the time the Oncor IRA was executed and remains true today.[180] Thus, a sale of the Hunt Shares is a "Transfer" of "LLC Units (or any interest (pecuniary or otherwise) therein or rights thereto)" under the Oncor IRA.

---

[178] *Indirect*, *Black's Law Dictionary* (5th ed. 1970). Under Delaware law "[b]ecause dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, we often rely on them for assistance in determining the plain meaning of undefined terms." *Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 228 (Del. 2010). New York courts will likewise refer to dictionaries to determine a word's ordinary meaning. *E.g. Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 71 N.E.3d 556, 561 (N.Y. 2017); *Arentz v. Morse Dry Dock & Repair Co.*, 164 N.E. 342, 344 (N.Y. 1928); *Ledon v. Havemeyer*, 24 N.E. 297, 299 (N.Y. 1890).

[179] *Involuntary*, *Black's Law Dictionary* (5th ed. 1970).

[180] Such an "undisputed background fact[]" is "appropriate for the trial court to consider . . . to place the contractual provision in its historical setting without violating [the principle that, if a

Because Borealis' purchase of the Hunt Shares would constitute a "Transfer" under the Oncor IRA, it triggered the requirement for TTI to deliver an Inside Offer to STH permitting STH to purchase the Hunt Shares.[181] Therefore, both Borealis and STH, under separate agreements, assert a legal right to purchase the Hunt Shares—those legal rights, however, are mutually exclusive because only one entity can own the Hunt Shares. This conundrum notwithstanding, my inquiry ends here because of the transfer restriction in the TTHC SA. That "Overriding Prohibition on Transfer" bars any Transfers (like the sale of the Hunt Shares to Borealis) if such Transfer would violate the Oncor IRA. Because upon the receipt of the Inside Offer STH will have a right to purchase the Hunt Shares—a right which it seeks to exercise—a sale of the Hunt Shares to Borealis pursuant to the valid exercise of Borealis' own right to purchase[182] instead would result in a breach of Section 3.9(a)

---

contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity]." *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, 2013 WL 1821608, at *4 (Del. Ch. May 1, 2013) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 n.7 (Del. 1997)). New York law similarly sanctions the use of "undisputed background facts" in interpreting an unambiguous contract. *E.g. Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996).

[181] Under the Oncor IRA, the triggering event for the delivery of an Inside Offer is TTI's "intent"—voluntary or involuntary—to transfer LLC Units "or an interest therein or rights thereto." I find that the parties meant "intent" here to mean TTI's expectation of a Transfer, and not some oxymoronic expression of involuntary desire on the part of an entity. The intent to Transfer occurred upon Hunt's commitment via the First Offer Notice to sell an indirect interest in Oncor to Borealis. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 n.21 (Del. 2010) (citing *Gore v. Beren*, 867 P.2d 330, 337 (Kan. 1994)) ("In placing a construction on a written instrument, reasonable rather than unreasonable interpretations are favored by law. Results which vitiate the purpose or reduce terms of the contract to an absurdity should be avoided.").

[182] In JX 231.

of the Oncor IRA.[183]  Because the TTHC SA explicitly bars a Transfer that breaches the Oncor IRA, STH's exercise of its right to purchase the Hunt Shares (through its designee STIH) will extinguish Borealis' own exercised right to purchase the Hunt Shares.  Thus, upon exercise of its ROFR right, STH will be the only party with the right to purchase the Hunt Shares.

## III. CONCLUSION

Hunt's First Offer Notice to Borealis, dated July 11, 2019, permitting Borealis to exercise its right to purchase the Hunt Shares gave rise to TTI's duty to deliver an Inside Offer (as defined in Section 3.9(b) of the Oncor IRA) to STH.  Upon the exercise of STIH's (as STH's designee) option to purchase the Hunt Shares pursuant to the Inside Offer, Borealis' right to purchase the Hunt Shares will be void, under the terms of the TTHC SA.  The parties should submit a form of order consistent with this Memorandum Opinion.

---

[183] I note that the mechanics of STH's ROFR in the Oncor IRA require TTI to deliver an Inside Offer to STH, which has not occurred here.  I have found that Borealis' exercise of its right to purchase the Hunt Shares gave rise to STH's contractual right to receive an Inside Offer from TTI. The parties' dispute here reflected an uncertainty over whether TTI must deliver such Inside Offer—that TTI has not delivered the Inside Offer is of no moment; the status quo order has prevented Hunt and STIH from consummating a sale to this point.  Because of these factors, I decline to consider whether TTI is in breach of the Oncor IRA at this time, as STH and STIH assert in claim four.  Likewise, because STH has not yet had the opportunity to exercise its right to purchase pursuant to an Inside Offer, I decline to reach STH and STIH's third claim—against Hunt—which will presumably become moot going forward.

**Figure A**[184]



[184] PTSO, ¶ 3 (underlining in original).

41